Kenneth E. Clemence *et al. vs.* Peter J. Mazika *et al.*

AUGUST 1, 1947.

Present: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

Flynn, C. J.   This bill in equity was brought by the owners of certain house lots on a plat to enjoin the respondents

from building a roadside stand on another lot of land located on said plat where the lots are alleged to have been restricted for residential purposes. After a hearing in the superior court on bill, answer and evidence, a decree was entered denying and dismissing the bill. The cause is before this court on the complainants' appeal from that decree.

The undisputed evidence shows the following facts. Richard E. O'Donnell and Claire C. O'Donnell, his wife, hereinafter referred to as the O'Donnells or sometimes as the common grantors, became the owners of a large tract of undeveloped land in the town of Smithfield in this state by virtue of two deeds from George Hayes.

The land was apparently divided by them into two sections, north and south. We are concerned here only with the south section. That was platted for development according to a plat entitled: "Map of Greenville Terrace—South Section—located in Smithfield R. I. Property of R. E. O'Donnell et. ux. Willard B Hall Surveyor May 1940", which plat was recorded on May 9, 1940 in the office of the town clerk on plat card 70. No restrictions of any kind were mentioned on or filed with reference to this plat.

The south section, as shown on said plat, bounds southerly on Putnam avenue, a public highway running generally east and west. Only two platted streets are shown in this development. Danecroft avenue, 45 feet wide, runs from Putnam avenue northerly through the entire depth of the platted land, dividing it into easterly and westerly portions. Briarcliff avenue runs westerly from Danecroft avenue into the westerly portion. No street runs from Danecroft avenue or Putnam avenue into the easterly or larger portion of the plat.

The land generally is divided into eighteen lots. Sixteen of these are shown as house lots which, with some exceptions not important here, are substantially the same general shape and size. The average house lot, excepting the corner lots, has a frontage of 75 feet on either one of the two platted

streets in the development and extends back from such street about 100 feet in depth.

The two remaining lots, numbered 2 and 3, are not thus divided into house lots. While lot 2 has a frontage of 75 feet on Danecroft avenue, that portion was not completed to conform to the adjoining house lots. On the contrary, it is shown on the plat merely as an entrance to the expanding area in the rear of the platted house lots appearing on the easterly side of Danecroft avenue. The area of lots 2 and 3 together appear to be over 179,000 square feet and, apart from the entrance on Danecroft avenue, this large area is not otherwise accessible to any of the platted streets and is not divided into house lots to conform with the other lots on the plat.

The O'Donnells began selling and conveying lots by reference to this recorded plat of the south section. They first conveyed two lots by separate deeds to two different grantees, and neither of these deeds contained restrictive covenants. Each was made subject to a previous mortgage of record which had contained no restrictive covenants.

The common grantors, by deed dated and recorded October 11, 1940, conveyed lot 7 on this plat to Hartwell Jagger and wife. This conveyance was made subject to the following covenants: "And the said grantees for themselves, their heirs and assigns, in consideration of the execution of this deed hereby covenants and agrees with and for the benefit of the grantors, their heirs and assigns, to hold the premises hereby conveyed, upon the following terms and subject to the following restrictions". Then followed fourteen "Protective Covenants And Restrictions Imposed By The Grantors" dealing with the sale of the premises for purely residential purposes; the cost, character and use of the buildings; the building heights and setbacks from lot lines; provision for the automatic extension of such restrictions for ten years "unless by a vote of the majority of the then owners of the lots it is agreed to change the said covenants in whole or in part"; and provision also that "If the parties

hereto, or any of them, or their heirs or assigns, shall violate or attempt to violate any of the covenants herein it shall be lawful for any other person or persons owning any real property situated in said development or subdivision to prosecute any proceedings at law or in equity" to prevent such violation.

By deed dated October 18 and recorded October 19, 1940, the common grantors next conveyed lot 9 on said plat to Kenneth E. Clemence and wife, subject substantially to the same restrictive covenants as appeared in the Jagger deed. The only important difference was that the covenant expressly binding the grantees, as first above quoted from the Jagger deed, does not appear in the Clemence deed, the restrictions following immediately the description of the land.

Subsequently the common grantors by three recorded deeds conveyed several other house lots on said plat to different grantees. None of such deeds included any reference to restrictions or restrictive covenants.

In December, 1940, the common grantors made a "Replat of Greenville Terrace—South Section", and a plat thereof was recorded on September 8, 1941, in the office of the town clerk of Smithfield on plat card 71. This replat contained no reference to restrictions of any kind and the changes from the original map of the south section are not important here except in one respect. Where lot 2 on the original plat had an entrance of 75 feet on Danecroft avenue, the replat converted that entrance into a house lot 75 feet by 100 feet to conform to the other platted house lots shown on the easterly side of Danecroft avenue. Thus the replat shows that lot 2 no longer had even a frontage or entrance upon either of the two platted streets in the developed portion. The testimony also showed that lot 2 was a large, rough, undeveloped, wooded tract of land which was not available for, or developed as, residential house lots as were the other lots on the plat.

The common grantors by deed dated July 25 and recorded July 29, 1941, conveyed to Edwin Garnett and wife, by metes

and bounds, all the land on this plat of the south section, excepting therefrom certain parcels which had been conveyed by said grantors by separate deeds, eight of which are therein identified by the name of the grantee, date of the deed, and the book and page number where the deed is recorded, and a few others by lot number. This deed contained no reference to restrictive covenants.

Thereafter the Garnetts by deed conveyed lot 8 on said plat to the Clemences, and the deed contained no restrictive covenant. It is noted that lot 8 adjoins lot 9, which had previously been conveyed to the Clemences by the common grantors with restrictive covenants as above set forth. The Clemences are two of the complainants here. Other conveyances were made later by the Garnetts by reference to the plat, but none of them contained any reference to restrictive covenants.

The Garnetts by deed dated July 3 and recorded July 5, 1946 then conveyed to the respondents lot 1 appearing on said plat as a developed house lot; and also in that deed the grantors conveyed an additional strip of land bounding on Putnam avenue 50 feet in width and extending back 103.22 feet, being a small portion of lot 2 that was adjacent to the rear or easterly boundary of lot 1 on said plat.

The evidence is in conflict concerning this transaction. Testimony of Edwin Garnett, one of the grantors in the respondents' deed and a complainant, tends to show that the respondents were told about the restrictions on the plat; that they could build only a residence; that the lot had been previously sold to a grantee who had been prevented by objections from other owners from building a store; and that his money had to be refunded. The testimony for the respondents tends to show that they had a residence elsewhere; that they bought expressly for the purpose of building a roadside stand; and that the grantors had told them there were no restrictions on the plat against such a building, although a couple of the owners of land might complain. While Jagger and Clemence testified generally that restric-

tions were mentioned when they bought their lots 7 and 9 from the common grantors, they admitted that they first saw such restrictions when they were read in their deeds. There is no other evidence that lots were being advertised or sold according to any consistent scheme of development of this section.

When the respondents refused to cease building operations after a notice from certain owners of lots on the plat, the present bill of complaint was brought by such owners to enjoin the violation of alleged building restrictions.

The trial justice found in substance and effect that whatever may have been the intention of the O'Donnells in including these restrictions in the deeds by which they conveyed lots 7 and 9 to the Jaggers and Clemences respectively, the whole tract never became restricted thereby or by reason of any consistent scheme that was intended by the common grantors to restrict all the lots on the plat to development for purely residential purposes. He also found that the respondents had no constructive notice of the restrictions contained in the two deeds relied upon by the complainants, because such deeds were not included in the chain of title to the particular land upon which the respondents had attempted to build a roadside stand.

The complainants claim that the trial justice was clearly in error. They contend that the restrictions recited in the Jagger and Clemence deeds also bound the common grantors to attach similar restrictions to all the unsold lots on the plat. They argue substantially that the question whether the common grantors, by inserting such restrictions in those two conveyances, thereby intended to restrict for purely residential purposes all the unsold lots on the entire plat is to be ascertained largely, if not entirely, from an examination of the restrictions themselves; that the establishment of a general consistent scheme of development for the whole tract is not material, or at least not controlling; and that questions of knowledge and notice are involved in fas-

tening such restrictions upon subsequent purchasers under the common grantors.

In our opinion the primary difficulty with the contentions of the complainants is twofold. First, they apparently recognize what is now generally well established, namely, that the basic question in this type of cause is whether the common grantors intended, by conveyances with such restrictions, to enter into reciprocal covenants binding themselves and their heirs and assigns to include in future conveyances similar restrictions as appurtenant to all the unsold lots upon the plat. But they seem to assume that the common grantors' intent in that respect is determinable from the language of the restrictions recited in the Jagger and Clemence deeds without allowing any consideration of other evidence that might be pertinent to such issue in the circumstances of the instant cause. Secondly, the complainants appear to misconceive the true basis and the extent of the decision as made.

In our opinion the trial justice was not clearly wrong in considering all the pertinent evidence as it related to the common grantors' intent concerning a consistent scheme, if any, for the development of the whole tract as purely residential house lots rather than confining himself merely to the restrictive covenants which appeared in the Jagger and Clemence deeds. The complainants argue as if these restrictive covenants were expressly reciprocal and by their terms were made binding upon the common grantors, and subsequent purchasers with notice, as to *all* the unsold land on the plat. If the restrictive covenants had been made expressly reciprocal and binding upon the common grantors and upon subsequent purchasers so as to burden all the lots upon the whole tract, or if proper restrictions had been filed on or with the recorded plat itself and conveyances thereafter had been made by reference thereto, the complainants' contention, that once such reciprocal rights were established the common grantors could not unilaterally destroy them, would have considerable force. However, in the absence of

such expressly stated covenants or filed restrictions, it becomes necessary to imply whether the common grantors intended to bind themselves and burden all the lots upon the whole tract with reciprocal equitable restrictions in the nature of negative easements, as they have been sometimes called. This is usually a question of fact, or at best a mixed question of fact and law.

An important element in determining the intent of a common grantor in that connection is to ascertain whether or not he has established by conduct and conveyances containing restrictive covenants a consistent scheme of development. See *Ham* v. *Massasoit Real Estate Co.*, 42 R. I. 293; *Beetchenow* v. *Arter*, 45 R. I. 133. See also *Ball* v. *Milliken*, 31 R. I. 36. In the circumstances of the instant cause, the existence or nonexistence of such an intent was largely a question of fact, and it was not error to consider all the evidence relevant to that issue rather than to confine its determination solely to the covenants in the Jagger and Clemence deeds.

In our opinion the complainants in their contentions also misconceive the true basis and extent of the trial justice's decision. Their arguments seem to proceed upon the premise that the cause involved the complainants' rights as if they depended on the common grantors' intent as to lot 1 on the plat; whereas we think that the decision was related to the evidence on the particular issue before the court, namely, the common grantors' intent as to *lot 2*, on which the respondents actually had a permit to build and were attempting to build a roadside stand. In his decision the trial justice stated, among other things: "Whatever may have been the intention of the O'Donnells in including these restrictions in the deeds to Lots Nos. 7 and 9 in October, 1940, no consistent scheme to restrict was followed by them either before or after the two conveyances in October. A larger number of lots had been sold free from restrictions than with restrictions. The *whole* tract never became restricted by reason of any scheme to restrict." (italics ours)

We understand that decision to mean that the question concerning the common grantors' intent as to the Jagger and Clemence lots, and perhaps as to the other lots that appear in the developed portion on the plat, was not before him for decision. The decisive question on the evidence was to ascertain whether the common grantors intended by their deeds to the Jaggers and Clemences to create impliedly reciprocal rights or interests in the nature of negative easements with reference to the *whole* tract, *i.e.,* so as to attach and make them appurtenant to all the common grantors' other land, including lot 2 on the plat, upon which undeveloped lot the respondents were building a roadside stand in alleged violation of restrictions.

From an examination of the evidence we cannot say that the trial justice was clearly wrong in holding in substance and effect that complainants had not sustained the burden of proving that the common grantors intended to restrict lot 2 in accordance with the covenants in the Jagger and Clemence deeds. There were no express reciprocal covenants here, and no restrictions were filed with or on the recorded plat. An actual examination of the plat will show, more graphically than our description, that the common grantors did not intend that all lots on the whole tract were to be treated and developed alike. Obviously sixteen lots on the plat were intended and made available for development as purely residential or dwelling sites. Each of those lots was accessible to a platted street. Lots 2 and 3, however, were not thus divided and developed; nor were they made immediately accessible to any platted street in the manner by which the sixteen developed lots were served.

Moreover, the undisputed evidence showed that the extensive area of lots 2 and 3, being large enough to supply twenty or more house lots of the type shown in the developed portion of the plat, was evidently not suitable for development as were the other sixteen lots, because lots 2 and 3 were rough, hilly and wooded. The first conveyances of lots by reference to the plat contained no reference to restric-

tions. In fact, only two of all the deeds delivered by the common grantors conveying lots on this plat contained any reference to restrictions. No deed referring to lots 2 and 3 contained any reference to restrictive covenants. Further, when the common grantors replatted the south section before they sold the remaining lots to the Garnetts, they confirmed their original intention by merging lots 2 and 3 into one lot numbered 2 and by cutting that lot off from entrance or accessibility to either of the platted streets appearing in the developed portion of the plat.

Whatever may have been the intention of the common grantors with reference to the sixteen residential lots which appear in the developed portion of the plat, and whatever equitable rights or interests, in the nature of negative easements, the owners of such lots may have between themselves are not now before us and need not be decided. So far as lot 2 is concerned, upon which lot the respondents obtained a permit to build a roadside stand, the pertinent evidence, including the plat and replat, the conduct of the parties, the nature of the developed lots, the character of lot 2, and the restrictive covenants, supports the conclusion of the trial justice that lot 2 was not intended by the common grantors to be in the scheme of development as purely residential lots.

It is arguable perhaps that such evidence might also justify a contrary conclusion. But that is not enough to warrant relief. Where the evidence is as reasonably open to the conclusion that the common grantors did not intend to include lot 2 in their scheme of development through restrictive covenants as it is to the contrary, the complainants cannot be said to have sustained the burden of proof. Because of our view on the decisive question in the cause, namely, that complainants have not proved the common grantors' intent to bind lot 2 by the restrictive covenants appearing in the Jagger and Clemence deeds, it becomes immaterial and therefore unnecessary for us to consider

whether the respondents had actual or constructive notice of the covenants in the Jagger and Clemence deeds.

The appeal of the complainants is denied and dismissed, the decree appealed from is affirmed, and the cause is remanded to the superior court for further proceedings.

Moss, J., did not participate in the decision.

*Ira Lloyd Letts, Andrew P. Quinn, Frank Licht,* for complainants.

*Kirshenbaum & Kirshenbaum,* for respondents.