**Nancy W. DeWOLF**

v.

**USHER COVE CORP.**

**Civ. A. No. 88–0289 P.**

United States District Court,
D. Rhode Island.

Aug. 4, 1989.

**1520**

Mark Freel, of Edwards & Angell, Providence, R.I., for plaintiff.

Stephen Rodio, and Gregory Benik, Providence, R.I., for defendant.

## OPINION AND ORDER

PETTINE, Senior District Judge.

Pursuant to 28 U.S.C. Sections 1332 and 2201, the plaintiff seeks a declaration of her rights regarding certain restrictive covenants purporting to control the construction of a house on her lot of land. Specifically, the plaintiff seeks to avoid being required to utilize a designated architect for the preparation of the architectural and landscaping plans and specifications for her home, and further asks this Court to declare that the plans and specifications that she has already purchased from the architect of her choice may be presumed to have been approved by the developer by virtue of its failure to respond to her request for approval within the 30 day response period specified by the covenants. Plaintiff also seeks a declaration that the defendant's option to repurchase plaintiff's lot because plaintiff failed to commence construction of her house within three years of the lot's purchase has not yet matured because the three year time period has been tolled by this conflict over the approval of her plans and specifications. In the alternative, plaintiff prays that, should the defendant now be allowed to exercise its option to repurchase the lot by virtue of plaintiff's failure to build within three years, the developer be required to repurchase the lot at fair market value not at purchase price plus 10% as specified in the covenants.

For the reasons which follow, judgment is entered for the defendant on all issues save that of the time frame within which defendant's preemptive repurchase right operates and the repurchase price for plaintiff's lot.

## I. FINDINGS OF FACT

This controversy concerns the development of a beautiful and unique shore area, referred to as Case Farm Estates, located in Bristol, Rhode Island, on a finger of land, Poppasquash Point, extending into Rhode Island's jewel of nature, Narragansett Bay. The developer's accent on exclusivity is manifest by a guarded gate barring access to a private road which extends the full length of the property.

The Case Farm Estates was purchased in 1982 by Eleanor Gustafson and her husband, Clifford S. Gustafson, in the hope of fulfilling a dream, born of their long professional experiences as, respectively, a real estate broker and construction contractor, to someday "do a development and do something really great." (Testimony of E. Gustafson, Tr. Vol. II, p. 91.) Following the purchase of the land and its approval for development as a rather up-scale subdivision "with open meadows and ... as few houses as possible" (Testimony of E. Gustafson, Tr. Vol. II, p. 93), the Gustafsons together formed the Usher Cove Corporation to implement their vision, issuing 100% of the stock to themselves, presumably in exchange for the transfer of the land to the corporate entity. Subsequently, 75 of the Estates' approximately 100 acres were divided into 20 individual house lots and offered for sale, with the remaining 25 acres together with the main house being retained by the Gustafsons.

In the late summer and again in the fall of 1984, the plaintiff, Nancy W. DeWolf,

and her husband, Walter DeWolf, who live in Colorado and plan to retire to Rhode Island, paid two visits to the Case Farm Estates and, as Mrs. DeWolf stated, "fell in love" (Testimony of N. DeWolf, Tr. Vol. I, p. 26) with a specific section designated as Lot No. 8, which encompasses a sort of knoll with an inspiring vista of the Narragansett Bay. Based upon these visits, Mrs. Gustafson and the DeWolfs entered into an oral agreement for the purchase of the lot, deferring the formalization of the purchase and sale to a later date. Before the formalization of the deal, however, the DeWolfs received at their home in Colorado an undated and unsigned copy of a document entitled "Declaration of Restrictions and Protective Covenants Imposed Upon Case Farm Estates Bristol, Rhode Island." Although all involved agree that the DeWolfs secured this draft of the restrictive covenants in question in December 1984 or January 1985,[1] there is uncertainty in the record as to how the document came to be in the DeWolfs' possession, with Mr. DeWolf asserting that it was provided to them by the Gustafsons (Testimony of W. DeWolf, Tr. Vol. II, p. 11), Mrs. Gustafson alleging that they were provided by the DeWolfs' real estate broker, Mary Jane Sheridan (Testimony of E. Gustafson, Tr. Vol. II, p. 118), and Ms. Sheridan stating that, "I don't recall sending them restrictions, I might have" (Testimony of M.J. Sheridan, Depo. Tr. p. 24).

However this draft found its way to the DeWolfs, it is unquestionably the version of the covenants on which the plaintiffs relied throughout their subsequent dealings with the Gustafsons (Testimony of W. DeWolf, Tr. Vol. I, p. 11.), despite the fact that these covenants were never recorded by the developer. In addition to the developer's statement of intent in the document's preamble,[2] five paragraphs are of such significance to the dispute that has since arisen between these parties that I reproduce them in their entirety, highlighting those portions that were subsequently changed in the recorded covenants. *See* Joint Exhibit (hereinafter "J. Ex.") 2.

Paragraph 4 reserved a far-reaching power of approval to the developer, vesting in Usher Cove Corporation the "absolute and exclusive right" to refuse to approve any building or landscaping plans which were not "in his opinion, suitable or desirable for any reason, including purely aesthetic reasons. . . ." This proviso also appointed a Boston, Massachusetts architectural firm as the developer's agent with respect to all such approvals. Paragraph 4 states in its entirety:

4. *All Structures to be Approved by Developer.* For the purposes of assuring the development of the Plat as a residential area of highest quality and standards, and in order that all improvements on each Lot shall present an attractive and pleasing appearance from all sides of view, the Developer reserves the exclusive right and discretion to control and approve the construction of all buildings, structures, and other improvements on each Lot in the manner and to the extent set forth herein. No building, fence, wall, driveway, swimming pool, or other structure or improvements, regardless of size or purpose, whether attached to or detached from the main residence, shall be commenced, placed, erected, or allowed to remain on any Lot, nor shall any additions to or exterior change or alteration thereto be made, unless and until building plans and specifications covering same, showing the nature, kind, shape, heights, size, materials, floor plans, exterior color schemes, location and orientation on the Lot, plans for the grading and landscaping of the Lot showing any changes proposed to be made in the elevation or surface contours of the land, approximate square footage,

---

1. The following chronology of the case is as stipulated by the parties in a document filed with the Court on June 30, 1989. *See* the Stipulation filed in the record of this case.

2. The preamble reads, in relevant part, that "it is the desire and intention of the Developer to impose certain protective covenants and restrictions for the mutual benefit of all the owners of any lot shown on the Plat as amended from time to time . . . in order to provide for and insure [sic] the orderly development of the Plat."

construction schedule, and such other information as the Developer shall reasonably require, have been submitted to and approved in writing by the Developer, his agent, or nominee, which approval shall be in recordable form. The Developer shall have the absolute and exclusive right to refuse to approve any such building plans and specifications and Lot-grading and landscaping plans that are not, in his opinion, suitable or desirable for any reason, including purely aesthetic reasons and reasons connected with future developments plans of the Developer of the Plat or contiguous lands. In passing upon such building plans and specifications and Lot-grading and landscaping plans, the Developer may take into consideration the suitability and desirability of proposed construction, the quality of the proposed workmanship, and quality of the materials proposed to be used. The Developer hereby appoints Royal Barry Wills Associates, Boston, Massachusetts, as its agent with respect to all approvals required herein.

Paragraphs 34 and 35 spelled out exactly how the approvals delineated in Paragraph 4 were to be obtained and evidenced. In essence, these provisions spelled out a formal approval process that was to be conducted, from initiation to completion, in writing:

34. *Approval of Developer.* Whenever the approval of the Developer is required by these Covenants and Restrictions, no action requiring such approval shall be commenced or undertaken until after a request in writing has been submitted to the Developer. The request shall be sent to Developer by Registered or Certified Mail with return receipt requested. If the Developer fails to act on any such written request within thirty (30) days after the date of receipt by the Developer, the approval of the Developer to the particular action sought shall be presumed; however, no action shall be taken by or on behalf of the person or persons submitting the written request which violates any of these Covenants and Restrictions.

35. *Evidence of Approval.* Whenever approval by Developer is required in these Covenants and Restrictions, same shall mean approval of any officer of Developer as evidenced by a certificate or other writing signed by an officer of Developer.

Paragraph 9 further reserved to the developer the right to repurchase any lot whose owner failed to commence construction of the main residence on the lot within three years of the date of purchase:

9. *Developer's Right to Repurchase.* If the owner of any Lot does not commence construction of the main residence on such Lot within three (3) years of the date of purchase of such Lot, then after such three (3) year period the owner of such Lot shall not convey, sell, or transfer title to such Lot without first giving the Developer, its successor, or assigns notice in writing of such proposed conveyance, and the Developer, its successors, or assigns, shall have the right to purchase such Lot for a purchase price equal to the purchase price for the Lot previously paid by the owner plus 10% of such purchase price for each full year that the Lot was owned by such owner. The Developer, its successors, or assigns shall exercise its right hereunder by giving written notice to the owner of the Lot within sixty (60) days of receipt of the owner's notice of intention to convey the Lot. All notices required hereunder shall be given by registered or certified mail, return receipt requested.

Finally, Paragraph 37 reserved to the developer a liberal power to amend or add to the covenants and restrictions:

37. *Amendments or Additional Restrictions.* The Developer reserves and shall have the sole right (a) to amend these Covenants and Restrictions, but all such amendments shall conform to the general purposes and standards of these Covenants and Restrictions, (b) to amend these Covenants and Restrictions for the purpose of curing any ambiguity in or any inconsistency between these provisions, (c) to include in any contract or deed or other instrument hereafter made,

any additional Covenants and Restrictions applicable to the Plat which do not lower the standards of these Covenants and Restrictions, and (d) to release any Lot from any part of these Covenants and Restrictions which have been violated (including, without limiting the foregoing, violations of building restriction lines) if the Developer, in its sole judgment, determines such violation to be a minor or insubstantial violation.

On February 5, 1989, defendant Usher Cove Corporation recorded in the Town of Bristol Land Evidence Records a "Declaration of Restrictions and Protective Covenants Imposed Upon Case Farm Estates, Bristol, Rhode Island" (hereinafter "the Covenants"). *See* J.Ex. 21. This document was in every detail identical to the draft covenants and restrictions procured by the DeWolfs a few months before, with one significant exception. While the draft version of Paragraph 4 had appointed the architectural firm of Royal Barry Wills Associates as the developer's agent for all approvals required under the covenants, the recorded covenants appointed the firm as the actual project architect as well as agent for all approvals. The revised portion of Paragraph 4 read in recorded form:

> The Developer hereby appoints Royal Barry Wills Associates, Boston, Massachusetts, as the architect for all structures on any Lot and appoints Richard Wills of said Royal Barry Wills Associates as its agent with respect to all approvals required herein.

It is clear from the record that the DeWolfs never received "a true copy" of this declaration and recording and thus were unaware, as the purchase of Lot No. 8 progressed toward finalization, of this critical change to Paragraph 4. (Testimony of N. DeWolf, Tr. Vol. I, p. 49.)

On May 13, 1985, three months after the recordation of the Covenants, the DeWolfs returned to Rhode Island to execute a Purchase and Sale Agreement for the purchase of Lot No. 8 in Case Farm Estates. *See* J. Ex. 8. Sometime in this same period of time but prior to the signing of the Agreement, the parties concur, the DeWolfs showed Mrs. Gustafson a line sketch of a house "that we really thought would be a pretty nice place to live." (Testimony of N. DeWolf, Tr. Vol. I, p. 31.) *See* J.Ex. 7. Although both the DeWolfs and Mrs. Gustafson agree that there was some discussion back and forth about the sketch, and that Mrs. Gustafson suggested various modifications that would make the house more in keeping with New England style homes, the parties sharply disagree as to the ultimate import of this conversation. In the DeWolfs' minds, this conversation was nothing less than an approval for construction at Case Farm Estates of the house depicted in the drawing following its design by a Colorado-based architect of the DeWolfs' choosing; in Mrs. Gustafson's mind, the exchange was nothing more than "general pleasantries about the house." *See generally* Testimony of N. DeWolf, Tr. Vol. I, pp. 31–34, 60–61, 65; Testimony of E. Gustafson, Tr. Vol. II, pp. 100–101.

On September 6, 1985, after the signing of the Purchase and Sale Agreement but prior to the actual closing on the property, Usher Cove Corporation exercised its right to amend under Paragraph 37 of the Covenants and recorded in the Town of Bristol Land Evidence Records a "First Amendment to Declaration of Restrictions and Protective Covenants Imposed Upon Case Farm Estates, Bristol, Rhode Island" (hereinafter "the First Amendment"). *See* J.Ex. 21. This Amendment dealt exclusively with changes to Paragraph 4 of the Covenants, clarifying the role of the project architect and designating a new firm to the position. Specifically, the heading and the first and last ·sentences of Paragraph 4 were amended as follows:

> 4. *Designation of Architect and Approval of Structures by Developer.* For the purposes of assuring the development of the Plat as a residential area of highest quality and standards, and in order that all improvements on each Lot shall present an attractive and pleasing appearance from all sides of view, the Developer reserves the exclusive right and discretion to control and approve the construction of all buildings, structures, and other improvements on each Lot in

the manner and to the extent set forth herein, and to designate the architect for such buildings, structures, and improvements.... The Developer hereby appoints Hugh Newell Jacobsen, F.A.I.A., of Washington, D.C., as the architect, for all buildings and structures on any lot and appoints him its agent with respect to all approvals required herein.

Although the Gustafsons did not give the DeWolfs actual notice of this Amendment, it is clear from a letter dated October 2, 1985 that Mr. Gustafson did forward to the plaintiffs a copy of a planning document entitled Project Architect's Program Outline For A New Residence and apparently used by Hugh Newell Jacobsen to locate houses at Case Farm Estates in relation to neighboring houses. In addition, the October 2d letter contained the following invitation to the DeWolfs to meet with Mr. Jacobsen: "Mr. Jacobsen will be at Case Farm on October 14th and 15th to meet with owners who plan to proceed with their houses in the near future. I am sure that he would like to meet you and review the placement of your house at that time." *See* J.Ex. 9. This letter was swiftly followed by a letter dated October 4, 1985, in which Mr. Gustafson further informed the DeWolfs that he was objecting to parts of the architectural services contract that Jacobsen had proposed to the Case Farm lot owners on the ground that the engineering for the electrical and mechanical work on the houses was not included in the package Jacobsen was offering. *See* J.Ex. 10. The substance of these letters leaves no doubt that the DeWolfs had available to them, by October 1985 at the latest, information that should have alerted them to the scope of the project architect's role in developing Case Farm Estates. Nevertheless the DeWolfs' response, in a letter dated November 25, 1985, makes it clear that, while they understood that Jacobsen's contract went to the provision of architectural design services by the project architect, they believed that "such a contract would not be applica-

ble in our case" given their intent to use existing construction drawings. *See* J.Ex. 12. In the words of Mrs. DeWolf, "We kind of thought that we had ... we were unique...." (Testimony of N. DeWolf, Tr. Vol. I, p. 74.)

It was not until October 25, 1985, after the recordation of the Covenants and the First Amendment to the Covenants detailed above, that Usher Cove finally conveyed Lot No. 8 in Case Farm Estates to Mrs. DeWolf through a warranty deed that explicitly stated that the premises "are conveyed together with and subject to certain restrictions and protective covenants" and further recited that the Covenants had been recorded on February 15, 1985 and amended on September 6, 1985. *See* J.Ex. 11. The DeWolfs were represented by an attorney throughout the closing. (Testimony of N. DeWolf, Tr. Vol. I, pp. 36–7.)

On January 28, 1986, Usher Cove amended the Covenants a second time, recording in the Town of Bristol Land Evidence Records a "Second Amendment to Declaration of Restrictions and Protective Covenants Imposed Upon Case Farm Estates, Bristol, Rhode Island" (hereinafter "the Second Amendment"). *See* J.Ex. 21. Once again, this Amendment was motivated by the defendant's desire to modify Paragraph 4, in large part because "Mr. Jacobson's contract was unacceptable." (Testimony N. DeWolf, Tr. Vol. I, p. 103.) *See also* J.Ex. 13. As in the case of the First Amendment, the Second Amendment further clarified the role of the project architect and named a third architectural firm, the Ekman Corporation, to the position. Additionally, the revised Paragraph 4 made explicit the developer's right to make future changes in architectural personnel without giving written notice to the lot owners.[3] The revised Paragraph 4 is reproduced below with the new provisions highlighted:

> 4. *Designation of Architect and Approval of Structures and Landscaping*

---

**3.** This Court notes in passing the general rule that, where a grantor conveys real estate subject to restrictive covenants, and reserves the right to amend, modify or remove those restrictions, he may do so without the consent of the grantee. *See, e.g., Big River Hills Ass'n, Inc. v. Altmann,* 747 S.W.2d 738 (Mo.Ct.App.1988); *Rosi v. McCoy,* 319 N.C. 59, 356 S.E.2d 568 (1987).

*by Developer.* For the purpose of assuring the development of the Plat as a residential area of highest quality and standards, and in order that all improvements on each Lot shall present an attractive and pleasing appearance from all sides of view, the Developer reserves the exclusive right and discretion to control and approve the construction of all buildings, structures, lot grading, planting and landscaping plans and other improvements on each Lot in the manner and to the extent set forth herein, and to designate the architect for such buildings, structures, and improvements. No building, fence, wall, driveway, swimming pool, or other structure or improvements including without limitation grading and landscaping, regardless of size or purpose, whether attached to or detached from the main residence, shall be commenced, placed, erected, or allowed to remain on any Lot, nor shall any additions to or exterior change or alteration thereto be made, unless and until building plans or landscaping and grading plan, as the case may be, and specifications covering same, showing the nature, kind, shape, heights, schemes, location and orientation on the Lot, plans for the grading and landscaping of the Lot showing any changes proposed to be made in the elevation or surface contours of the land, approximate square footage, construction schedule, and such other information as the Developer shall reasonably require, have been submitted to and approved in writing by the Developer, his agent, assignee, or nominee, which approval shall be in recordable form. No trees or bushes or shrubs shall be planted within twenty-five feet of any other tree, bush or shrub and no trees, bushes or shrubs shall be permitted in excess of eight (8) feet in height (or if planted at less that eight (8) feet in height allowed to grow in excess of eight (8) feet) unless plans for such planting or landscaping have been submitted to and approved in writing by the Developer, his agent, assignee or nominee which approval shall be in recordable form. The Developer shall have the absolute and exclusive right to refuse to approve any such buildings plans and specifications and lot-grading and landscaping plans that are not, in his opinion, suitable or desirable for any reason, including purely aesthetic reasons and reasons connected with future development plans of the Developer of the Plat or contiguous lands. In passing upon such building plans and specifications and lot-grading and landscaping plans, the Developer may take into consideration the suitability and desirability of proposed construction, the quality of the materials proposed to be used.

The Developer hereby appoints Edward O. Ekman, Jr. of the Ekman Corporation of Warwick, Rhode Island, as the architect, for all buildings and structures on any Lot and, without relinquishing its right to grant approvals in addition to approvals granted by the aforesaid architect, appoints him its agent with respect to all approvals required herein. The Developer, his assignee or nominee hereby reserves the right to appoint, without the necessity of obtaining consent or approval from lot owners in the Plat (such consent and approval shall be deemed to be given hereby), another or additional architects by giving written notice thereof to the Lot owners of the Plat.

As before, although the DeWolfs were not given a true copy of the Second Amendment, they did receive a letter dated December 4, 1985, informing them of Hugh Newell Jacobsen's termination and of the engagement of Edward O. Ekman, Jr. as the project architect. The December 4th letter, which referenced the DeWolfs' letter of November 25, 1985 asserting that the Covenants did not apply to them, made it absolutely clear that the Gustafsons did indeed expect that the DeWolfs would work with the project architect in designing their house. Specifically, Mr. Gustafson wrote:

Many of the purchasers have made one line scales [sic] drawings of their space requirements as a guide to the Project Architect in proceeding with discussions with his clients and finally into working

drawings. We are sure that Mr. Ekman can take your ideas and prepare working drawings for a house that will be compatible on the exterior with the overall architectural concept. The contract will be between you and Mr. Ekman and his fee is 10% including the mechanical and electrical.

*See* J.Ex. 13. Once again, however, the DeWolfs persisted in their belief that the requirement of working with the project architect did not apply to them. (Testimony of N. DeWolf, Tr. Vol. I, pp. 72–4.)

It was not until July 26, 1987, fully eighteen months after the recordation of the Second Amendment, that the plaintiffs submitted to Usher Cove a written request for architectural and landscaping approvals of the completed plans for their home. *See* J.Ex. 14. In response, they received from Mr. Gustafson, acting in his capacity as President of Usher Cove Corporation, a letter dated August 7, 1987 stating explicitly that the plans would not be approved until they were submitted to Usher Cove by the Ekman Corporation, "as they are the Project Architect as noted in the deed." *See* J.Ex. 16. After the DeWolfs wrote on August 20th questioning the developer's insistence that they adhere to the requirement imposed by the Covenants of working with the project architect, *see* J.Ex. 17, Mr. Gustafson wrote again on August 31, 1987 expressing regret that "if from our casual conversation about your present house and plans for same you concluded that you were not required to abide by the Restrictions on this matter" and stating emphatically, "Please be advised that you must employ the Ekman Corporation to draw the plans and write the specifications for your house prior to our approving same." *See* J.Ex. 18. By letter dated September 30, 1987, the DeWolfs subsequently sent the plans to Ekman Corporation for approval. Nowhere in this letter, however, did the DeWolfs solicit Ekman's input into their plans. *See* J.Ex. 19. After receiving no response from Ekman, who testified that he did not respond because he had never been requested to give input into designing the DeWolfs' plans as required by the Covenants (Testimony of E. Ekman, Tr. Vol. II,

pp. 77–8), Mr. DeWolf wrote to Usher Cove on November 21, 1987 invoking Paragraph 34 of the Covenants and stating that he presumed approval based on both Usher Cove's and Ekman's failure to respond within 30 days to the request for approval. *See* J.Ex. 20. The response to this letter came from counsel for Usher Cove Corporation, who repeated the developer's insistence that architectural plans be prepared by the designated architect in accordance with the Covenants and threatened to "take all steps necessary to assure that you comply with these regulations, including any appropriate legal action." *See* Pl.Ex. 24. Subsequently, the DeWolfs commenced this action seeking declaratory relief on May 10, 1988.

## II. ANALYSIS

### A. *The Law Governing Restrictive Covenants in Rhode Island*

Before delving into plaintiff's particular complaints, I begin by noting the fundamentals of the law of Rhode Island, which must be applied in this case, with regard to restrictive covenants.

#### 1. Character, Creation and Enforceability

As a general rule, restrictive covenants are designed to be binding conditions of mutual benefit to the grantor and grantee of land, both seeking to enhance the value and marketability of the property. Indeed in a case such as this one, involving a recorded plat, *see* J.Ex. 1, whose lots have been conveyed by reference to the plat and subject to certain building restrictions contained in the deeds, the Supreme Court of Rhode Island finds the mutuality requisite to a binding contractual agreement in the very structure of the subdivision thus conveyed:

> It is undoubted that, when the owner of a subdivided tract conveys the various parcels in the tract by deeds containing appropriate language imposing restrictions on each parcel as part of a general plan of restrictions common to all the parcels and designed for their mutual benefit, mutual equitable servitudes are

thereby created in favor of each parcel as against all the others.

*Bessette v. Guarino*, 85 R.I. 188, 191–92, 128 A.2d 839, 841 (1957) (citing *Werner v. Graham*, 181 Cal. 174, 183, 183 P. 945, 949). In the parlance of the law of property, the insertion, in apt language, of like restrictive covenants into the deeds of all lots in a subdivided tract establishes the existence of a common scheme or plan to benefit all grantees enforceable against both the initial and subsequent grantees, *id.*, 128 A.2d at 841–42, subject of course to a change in conditions sufficient to defeat the purpose of the restrictions, *see, e.g., Duffy v. Mollo*, 121 R.I. 480, 485–86, 400 A.2d 263, 266 (1979), or unless the grantor has lost his right to further enforce the covenant due to its discharge or extinguishment. *See generally* 20 Am.Jur.2d, Covenants, Conditions and Restrictions Secs. 268–87. *See also Emma v. Silvestri*, 101 R.I. 749, 751–52, 227 A.2d 480 (1967) ("It is well settled ... that where, in conformity with a general plan for development, the owner of property divides it into building lots and conveys them subject to restrictions, intending to thereby promote a uniform plan of development for the plat consistent with such restrictions, any subsequent owner may enforce the restrictions against any other grantee or the present owner of such lots."); *Noonan v. Cuddigan*, 85 R.I. 328, 332, 131 A.2d 241 (1957) (if original grantor filed with recorded plat the restrictions sought to be enforced and inserted in apt language in deeds to grantees convenants to impose the restrictions on all of the remaining lots for the common benefit of its grantees, the restrictions are enforceable *inter sese* ); *Clemence v. Mazika*, 73 R.I. 254, 54 A.2d 379 (1947) (important element in determining grantor's intent to bind by restrictive covenants is whether a consistent scheme of development has been established by conduct and conveyances containing covenants).

■ Underlying the Supreme Court of Rhode Island's recognition of the binding nature of restrictive covenants created by inclusion in a deed is, of course "the equitable principle of notice; that is, a person taking title to land with notice of a restriction upon it will not, in equity and good conscience, be permitted to violate such restriction." 20 Am.Jur.2d, Covenants, Conditions and Restrictions Sec. 304. Conversely, a purchaser for value who lacks notice of restrictive covenants takes the land free of the restrictions. In addition, Rhode Island recognizes, as correctly stated by the defendant in its Post–Trial Brief, "that the recording of restrictive covenants serves as constructive notice to all persons of their content and, as such, [renders the covenants] binding," whether or not the purchaser received actual notice of the restrictions and even where other circumstances may fail to notify someone of the covenants. *See* R.I.Gen.L.Secs. 34–13–1 and 34–13–2. *See also Speedy Muffler King, Inc. v. Flanders*, 480 A.2d 413 (R.I. 1984). *Cf. Beetchenow v. Arter*, 45 R.I. 133, 137, 119 A. 758 (1923) (where neither recorded plat nor deeds in chain of title contained language purporting to restrict use of land, subsequent purchaser of lot without restrictions lacked constructive notice of covenants binding lots with restrictions). Only if the grantor has engaged in fraudulent conduct or deceit will the recording of restrictive covenants fail to serve as constructive notice of their content. *Davies v. Little*, 111 R.I. 496, 304 A.2d 661 (1973); *Hunt v. Barker*, 22 R.I. 18 (1900). In sum, restrictive covenants imposed in furtherance of a building or development scheme will generally be enforced against anyone with actual or constructive notice of the restrictions.

### 2. Construction and Validity

■ Assuming recorded covenants such as the ones at issue in this case, the general rules in Rhode Island governing their construction comport with the weight of authority and are essentially the same as those applicable to any contract or covenant. As succinctly articulated by Mr. Justice Kelleher, of the State Supreme Court, in *Gregory v. State, Dept. of Mental Health, Retardation and Hosps.*, 495 A.2d 997, 1000–01 (R.I.1985):

In construing the terms of a restrictive covenant, we are mindful of the oft-re-

peated maxim that restrictive covenants are to be strictly construed in favor of the free alienability of land while still respecting the purposes for which the restriction was established. *Hanley v. Misischi*, 111 R.I. 233, 238, 302 A.2d 79, 82 (1973); *Emma v. Silvestri*, 101 R.I. 749, 751, 227 A.2d 480 (1967). Further, we have held that cases involving the interpretation of restrictive covenants must be decided on a case-by-case basis since they "present such a wide spectrum of differing circumstances." *Hanley v. Misischi*, 111 R.I. at 238, 302 A.2d at 82; *see also Farrell v. Meadowbrook Corp.*, 111 R.I. 747, 750, 306 A.2d 806, 808 (1973).

Here, the covenant itself contains no definitions.... The task presented to this court, then, is the narrow one of construing the meaning of these terms. As in statutory construction, these words should be given their plain and ordinary meaning unless a contrary intent is discernible from the face of the instrument. *Lancellotti v. Lancellotti*, 481 A.2d 7, 10 (R.I.1984); *Little v. Conflict of Interest Commission*, 121 R.I. 232, 397 A.2d 884 (1979).

*See also Belliveau v. O'Coin*, 557 A.2d 75, 77 (R.I.1989). Stated differently, where the language of a restrictive covenant is unambiguous on its face, there is no room for interpretation and the plain meaning rule applies to its construction. Where there is ambiguity, however, the intention of the parties as shown by the covenant governs, subject to the further rule that the ambiguity is to be resolved in favor of an unrestricted use. *Emma v. Silvestri*, 101 R.I. at 751 ("... the general rule concerning restrictive covenants is that they are to be construed strictly so as to favor an unrestricted use of property, are not to be extended by implication, and if there is ambiguity, it is to be resolved in favor of an unrestricted use.") Further, although restrictive covenants are not to be extended by implication, neither are they to be construed unreasonably so as to defeat the restrictions' obvious purpose.

Finally, with regard to the validity of covenants like those at issue in this case, this Court concludes, from the number and variety of restrictions upheld by the courts of Rhode Island, that the State would generally uphold such covenants as creating a valid contractual relationship so long as they are not contrary to public policy or law or are not unreasonably or arbitrarily enforced. *See generally* 20 Am.Jur.2d, Covenants, Conditions and Restrictions Sec. 182–84.

It is against this doctrinal backdrop that this case must be decided.

### B. *Enforceability of Paragraph 4, As Amended*

Plaintiff alleges that Paragraph 4 of the Covenants, as amended by the First and Second Amendments, is unenforceable to the extent that it requires the preparation by a designated project architect of the plans and specifications for structures and buildings constructed within the Plat. Plaintiff makes several arguments in support of her position:

First, she contends that she is not bound by the provisions of the recorded restrictions to the extent that they differ from the draft restrictions provided to her by Usher Cove Corporation and represented as being identical to the restrictions it intended to record. In effect, Mrs. DeWolf is arguing both that she was misled by false and misleading representations that conflict with the recorded state of title of Lot No. 8 and that she was, as a result, never put on notice that she would be required to use the services of a designated architect. In a closely related argument, Mrs. DeWolf also contends that verbal assurances made by Mrs. Gustafson in May 1985 that the ranch house depicted in the line sketch shown to her would be acceptable with only minimal changes further misled Mrs. DeWolf into justifiably relying on the draft covenants. Mrs. DeWolf's point seems to be that Mrs. Gustafson, by her comments, approved the DeWolfs' proposed plan in keeping with the draft covenants' requirement that the developer approve all structures within the Plat, thereby creating the impression that the DeWolfs were proceeding in compliance with whatever requirements they were to

be bound by in purchasing Lot No. 8. This confusion was further compounded, Mrs. DeWolf asserts, by the Gustafsons' failure to correct the DeWolfs' misimpression at any point along the way.

Mrs. DeWolf's third point is that a restrictive covenant such as that embodied in Paragraph 4, which requires the use of a specific architect to design all homes within a Plat, is per se unenforceable as unreasonably restrictive. In plaintiff's view, defendant can adequately accomplish its purpose of controlling the type and quality of homes within the Plat through its plan-approval requirements, and thus the requirement of using a designated architect unnecessarily restricts the property without conferring a mutual benefit upon the grantees.

Finally, plaintiff contends that the language of Paragraph 4 designating an architect is ambiguous on its face and thus should be interpreted to require only submission of plans for approval by the architect. This interpretation, plaintiff again reasons, would promote the purpose of the covenant while at the same time favoring a policy of not unnecessarily restricting plaintiff's free and full enjoyment of her property.

### 1. Unenforceability As Applied

Plaintiff's first argument, i.e. that defendant, having misled plaintiff as to the substance of Paragraph 4 of the restrictive covenants and its applicability to the design of her home is now estopped from enforcing it against plaintiff, is, in essence, an absence of legally sufficient notice argument. As such, the key to plaintiff's position is, of course, the presence of fraud or misrepresentation on the part of Usher Cove Corporation. *See* discussion of notice at pp. 15–6 *supra*. *See generally Campanelli v. Vescera*, 75 R.I. 71, 63 A.2d 722 (1949).

On the record before this Court, there appear three possible "moments" in this entire course of dealing in which the misrepresentations which plaintiff allegedly re-

lied on to her detriment could conceivably have occurred: in the context of statements made about the draft covenants; in the context of statements made about the DeWolfs' line sketch; or in the context of the Gustafsons' alleged failure, over the nearly two years between the closing on Lot No. 8 and the DeWolfs' submission for approval of their final plans, to clarify the situation and make it clear that they intended to insist upon the requirements of Paragraph 4. In none of these three contexts can this Court find sufficient evidence to justify plaintiff's claim that she lacked notice and thus that the duly recorded restrictive covenants at issue here are not binding on her.

■ Assuming first for the sake of argument that the Gustafsons were in fact the source of the draft covenants relied on by the DeWolfs, a fact not proven on this record, there is nonetheless not one scintilla of evidence, either direct or circumstantial, that the Gustafsons made any definite, intentional statement to the effect that the undated and unsigned draft covenants mailed to the DeWolfs at their home in Colorado conformed to the recorded covenants in effect at the time of the closing. Indeed plaintiff has simply failed to adduce any evidence that would allow this Court to conclude that the Gustafsons intended to mislead the DeWolfs as to any of the restrictions placed on the Case Farm Estates development. On the contrary, this record reveals that the negotiations for Lot No. 8 were arms-length transactions conducted by sophisticated parties[4] who were represented by legal counsel at all time relevant to finalizing the deal. These facts, coupled with the additional fact that the DeWolfs took the property subject to a warranty deed which specifically incorporated the restrictive covenants as recorded in February 1985 and amended in September 1985, lead inexorably to the conclusion that the DeWolfs had legally sufficient notice of the restrictions being placed on their property

---

**4.** Mrs. Gustafson's seventeen years of experience as a real estate broker is more than balanced in this Court's mind by Mr. DeWolf's thirty-three years as an engineer at Ford Aerospace where he was, by his own admission, "frequently involved with interpreting ... contracts." (Testimony of W. DeWolf, Tr. Vol. II, p. 10.)

and are, therefore, bound by them, their confusion as to the significance of the draft covenants notwithstanding.

■ In a related vein, this Court further finds plaintiff's interpretation of the May 1985 conversation with Mrs. Gustafson unpersuasive. Although there can be no doubt that, in the words of Mr. DeWolf, the Colorado couple "got the clear impression from Mrs. Gustafson that there was no problem in building the house that we were interested in building on that particular lot" (Testimony of W. DeWolf, Tr. Vol. I, p. 86), there is in fact nothing in the record to support the plaintiff's claim that Mrs. Gustafson actively misled the DeWolfs into thinking that they were being released from the requirements of Paragraph 4 or that the covenants were being waived as to them. Instead a close examination of the hearing transcript reveals that Mrs. DeWolf in fact carefully avoids characterizing the conversation as an approval of the plans roughed out in the line sketch (Testimony of N. DeWolf, Tr. Vol. I, p. 60), and quotes Mrs. Gustafson only as saying that she could "negotiate" a one story dwelling (*id.* at p. 61) and as suggesting modifications that would make the house depicted "more in keeping with this part of the world" (*id.* at p. 33). *See generally* Testimony of N. DeWolf, Tr. Vol. I., pp. 31–4, 60–5. In light of this somewhat equivocal testimony, this Court cannot say that the DeWolfs' version of the conversation is any more credible than Mrs. Gustafson's recollection, to wit that the conversation consisted of no more than "general pleasantries" about a house that prospective buyers might one day build should they decide to go through with the purchase of land at Case Farm Estates. (Testimony of E. Gustafson, Tr. Vol. II, pp. 100–01.)

In addition, this Court sees no logical inconsistency between the DeWolfs' version of the conversation and the requirements of Paragraph 4. As explained by both the architect, Edward O. Ekman, Jr., and other residents of Case Farm Estates testifying at the hearing, the design process employed by the project architect began with each client's own ideas and sketches for their home, which plans were then modified in certain exterior details to conform to the uniform style cultivated at the development. *See* Testimony of E. Ekman, Tr. Vol. II, pp. 54–5; Testimony of S. Duffy, Tr. Vol. II, pp. 25–6; Testimony of D. Ramsbottom, Tr. Vol. II, p. 41. Thus the mere fact that Mrs. Gustafson may have encouraged the DeWolfs to proceed with the development of a house they felt personally comfortable with does not *ipso facto* negate the requirement that this house be designed in conformity with the common architectural style adopted for the plat. For these several reasons, plaintiff cannot rely on this conversation, which pre-dated the closing on Lot No. 8 by several months and occurred at a time when both parties were in the process of solidying their bargaining positions, to establish her claim that she was somehow misled as to the nature or import of Paragraph 4.

■ Finally, as to the plaintiff's claim that the Gustafsons' failure to correct them in their misunderstanding amounted to a kind of deceit that negates the covenant as to them, this Court can only point to the many letters exchanged between the parties, and detailed above at pages 11–3, as clear evidence that the Gustafsons were actually proceeding under the assumption that the DeWolfs were aware of and understood the recorded covenants, conscientiously keeping the DeWolfs apprised of relevant developments without seeing the further need to interpret the import of these developments to them. Thus this final argument as to the failure of Paragraph 4 by reason of fraud or misrepresentation also fails.

### 2. Unenforceability Per Se

Plaintiff has argued further, however, that the covenant requiring the use of a project architect is not only invalid as applied because she lacked sufficient notice of its contents but is also per se unenforceable as unreasonably restrictive. In making this argument, plaintiff does not deny that the law of Rhode Island, reviewed above at pages 13–7 and aptly summarized by defendants, "recognize[s] that recorded restric-

tive covenants are enforceable where they are enacted pursuant to a general plan of development, uniformly apply to all property located in a subdivision and thus mutually benefit it, and are exercised reasonably and in good faith." D. Post–Trial Brief, p. 12. Plaintiff insists, however, that, because the developer's purpose of ensuring certain standards of development within the plat can reasonably be fulfilled through the exercise of its right to approve all plans and specifications for building, structures and improvements undertaken at Case Farm Estates, the more restrictive covenant requiring the exclusive use of a designated project architect is invalid as not reasonably necessary to ensure maintenance of the standards sought by the grantor and thus violative of the cardinal principle that restrictive covenants are to favor the free alienability of land.

The parties have not cited to this Court, nor have I been able to find, any state precedent adjudicating the validity of a covenant like the one at issue here. In support of her position, however, plaintiff rests heavily on the New Jersey case of *Urban Farms, Inc. v. Seel*, 87 N.J.Super. 177, 208 A.2d 434 (1965), *aff'd.*, 90 N.J.Super. 401, 217 A.2d 888 (1966). In *Urban Farms*, the Superior Court of New Jersey found unenforceable a restriction in a contract of sale requiring the grantor's approval of any contractor selected by grantees to construct their residences, on the ground that requisite consideration, that is, reciprocal or mutual burdens and benefits, was lacking. In arriving at this conclusion, the Court relied almost exclusively upon its finding that the restriction at issue served no purpose of mutual benefit to all lot owners within the development, but instead conferred the purely personal benefit upon the developer of a 6% commission payable to the developer by the designated contractor on each unit constructed.[5] With respect for the purposes for which the covenant was created as its guiding principle,

the Superior Court concluded, on the facts before it:

> According to plaintiff, this requirement [of approving any contractor selected to build on Urban Farms] assures that the residences will be of sufficient quality and the builder of adequate solvency.... The court cannot agree that such a purpose is served by the requirement. The type and quality of home which a resident plans to construct is more than adequately controlled by plaintiff's requirement that plans and specifications be submitted for approval. The solvency of contractors selected by the residents of the community appears to concern plaintiff only to the extent of whether the proposed builder can afford to pay a 6% commission to plaintiff.... There is no indication that the payment of such a commission to plaintiff enhances the over-all community or that the restriction in the deed comprises neither a legal restriction nor an equitable servitude upon the estate. "This is so because whatever the effect of the burden of the covenant, its benefit is clearly personal to the grantor, securing to him a mere commercial advantage in the operation of his business and not enhancing or otherwise affecting the use or value of any retained lands." *Caullet v. Stanley Stillwell & Sons, Inc.*, 67 N.J.Super. 111, 117, 170 A.2d 52, 53 (App.Div.1961).

The *Urban Farms* approach is entirely consistent with that generally taken in Rhode Island of enforcing restrictive covenants that serve a valid purpose of mutual benefit to all lot owners in a subdivision while declining to enforce restrictions that inure solely to the benefit of the developer at the expense of owners' unrestricted use and enjoyment of their premises. In the case at bar, however, application of this same analytical method dictates a contrary result. It is undisputed that the purpose sought to be served by the covenant in question is to assure a uniform type

---

5. This Court notes in passing that not only does Usher Cove not derive such personal financial benefit from its designation of Ekman as the architect for the development, but that the developer aggressively negotiated on behalf of its owners with a series of architects in an effort to ensure that the designated project architect would charge design fees consistent with the standard of the industry. (Testimony of E. Ekman, Tr. Vol. I, pp. 75, 78–9.)

and quality of home at the Case Farm Estates, a purpose repeatedly upheld as valid by the legion of cases enforcing restrictive covenants intended to preserve the harmony of exterior design, or more generally the aesthetic qualities, of a residential area. *See generally* cases collected at 40 A.L.R.3d 864 (1971), Validity and Construction of Restrictive Covenant Requiring Consent to Construction On Lot. Rather than spell out in the Covenants, however, the architectural details of a uniform style of home to be built in the development, the developer in this case opted instead to craft a restriction that combined use of a common architect with final approval of plans and specifications drawn by that architect to achieve the stated purpose. The result achieved by this approach is exactly that intended by the developer. A view of Case Farm Estates reveals an obviously uniform and high quality development. *See also* J. Ex. 23. In addition, the result is one that the other members of the Case Farm Estates community, who testified emphatically to the benefits that they both bargained for in buying into Cove Farm and derive from the success of the development, are actively committed to. *See generally* Testimony of S. Duffy and D. Ramsbottom, Tr. Vol. II, pp. 22–47.

This Court thinks it clear that this one-to-one correspondence between the purpose of ensuring a uniform type and quality of home and the designation of a project architect charged with the responsibility of designing compatible buildings throughout the plat distinguishes this case from *Urban Farms*. As the *Urban Farms* court noted, requiring a specific contractor to erect a house already designed does not directly accomplish the developer's purpose of ensuring uniformity of design. In this regard, the requirement of utilizing a designated architect is more akin to the covenant requiring approval of plans and specifications upheld in *Urban Farms* than it is to the designated contractor requirement rejected in the case. In sum, unlike the restriction imposed in *Urban Farms*, the requirement at issue here is narrowly tailored to achieve its intended purpose, tremendously effective in accomplishing that result and of universal applicability and benefit to all owners in the plat.

In addition, the approach chosen by Usher Cove to achieve uniformity of exterior design within the plat is fairly analogized to those covenants, routinely upheld by courts, which predicate the exercise by the developer of approval rights not grounded in objective standards on the existence of a common neighborhood scheme of development to guide the exercise of the developer's discretion. *See, e.g., Syrian Antiochian Orthodox Archdiocese v. Palisades Associates*, 110 N.J.Super. 34, 264 A.2d 257 (1970) (where existence of neighborhood scheme clear, and purpose of provision requiring developer's approval of building plans was to afford mutual protection to property owners against injury resulting from construction that was unsightly, in singularly bad taste, discordantly at variance with neighboring homes in architectural appearance, or otherwise offensive to the standards of the neighborhood, covenant requiring approval valid and enforceable despite absence of objective standards to guide the determination); *Rhue v. Cheyenne Homes, Inc.*, 16 Colo. 6, 449 P.2d 361 (1969) (restrictive covenant requiring approval of structures by an architectural control committee enforceable despite absence of specific standards where covenant is enacted pursuant to general plan of development, uniformly applies to all lots, and is exercised reasonably and in good faith). In short, by serving as a proxy for a common scheme of development, the requirement of utilizing a designated architect ensures that the broad right of approval retained by the developer is exercised reasonably and in good faith, as required by law.

██ There is buried in plaintiff's argument a more subtle point, however. Since the designation of a project architect is, in effect, but the personification of a common architectural scheme for a plat, and since Ekman was not the designated architect at the time of the closing, how, the DeWolfs question, can they be held to an architectural style of which they had no notice when they finalized the purchase of Lot

No. 8? It is true that, at the time the DeWolfs closed on Lot No. 8, the designated project architect was not Edward O. Ekman, Jr., but was instead Hugh Newell Jacobsen. It is also evident from the testimony of both parties that, at the time that Lot No. 8 changed hands, the Gustafsons contemplated a New England style of shingled housing, similar in broad outline to the homes subsequently built at Case Farm Estates, but had not yet settled on the kind of exterior design details embodied by the Ekman style of design. Nevertheless, although this Court can appreciate the frustration felt by plaintiff at the designation of Ekman as project architect three months after the closing, two facts are indisputable that this Court thinks completely disposes of this point: first, the DeWolfs did have notice at the closing of the project architect requirement; and second, in both the draft covenants on which the DeWolfs admittedly relied and in the recorded covenants as amended, Usher Cove had clearly reserved the right to amend this requirement.

■ Although this Court has been unable to locate any Rhode Island cases adjudicating the validity of a subsequent amendment to original restrictive covenants governing a subdivision, the general rule is accurately stated in the case of *Hanchett v. East Sunnyside Civic League*, 696 S.W.2d 613 (Tex.Ct.App.1985). In the words of the *Hanchett* court:

> In order for a subsequent instrument to amend the original restrictive covenants governing a subdivision, three conditions must be met. First, the instrument creating the original restrictions must establish both the right to amend such restrictions and the method of amendment. (citing cases) Second, the right to amend such restrictions implies only those changes contemplating a correction, improvement, or reformation of the agreement rather than a complete destruction of it. (citing cases) Third, the amend-

ment to the restrictions may not be illegal or against public policy. (citing cases)

In the case at bar, there is no question that, under the rule summarized in *Hanchett*, the amendment naming Ekman the project architect is valid. Paragraph 37 of the original covenants clearly states that the developer reserves the sole right to amend the restrictions; the Second Amendment clearly involved the clarification and reformation of the agreement, not its complete destruction; and, as discussed at length above, the amendment is not illegal or against public policy. In addition, the Second Amendment conforms to the further requirement enunciated in Paragraph 37 of consistency with the general purposes and standards of the Covenants as first recorded. Finally, this Court notes that there is no evidence in the record that the switch to Ekman, only three short months after the closing but fully eighteen months before the DeWolfs made any attempts to finalize their building plans, in any way materially damaged plaintiff. The De-Wolfs have neither asserted nor proven that they had completed work on their plans by January 1986, the date of the Second Amendment.[6] Furthermore, since Ekman has made clear his willingness and ability to modify owners' existing plans, whatever investment the DeWolfs made in plans in Colorado is not lost by virtue of the Second Amendment. For these reasons, plaintiff's second argument for the per se invalidity of Paragraph 4 also fails.

■ Finally, as to plaintiff's argument that Paragraph 4 is ambiguous and therefore should be read only to require final approval of plans and specifications by the developer, this Court thinks the restriction's meaning plain on its face.

To conclude, although this Court is, of course, sympathetic to the complications faced by the DeWolfs in working out their

---

**6.** In this regard, the Court is also mindful of the fact that other owners at Case Farm Estates, who had early involvement with Hugh Newell Jacobsen, willingly proceeded with Edward O. Ekman, believing that mutual adherence to the restrictive covenants maximized the benefits of

ownership in the development. *See* Testimony of S. Duffy, Tr. Vol. II., p. 5 ("We all went through this and we all followed the rules and we all got what we want."); Testimony of D. Ramsbottom, Tr. Vol. II, p. 42 (... "I think we should all adhere to the same covenants.").

arrangements with Usher Cove Corporation, two thousand miles away from their home in Colorado, such complexities cannot alter the essential fact that the DeWolfs purchased Lot No. 8 of a recorded plat subject to recorded building restrictions incorporated by reference into the deed for the parcel, and consequently must take the land subject to those restrictions. Since, on the date of the closing, the recorded covenants, as amended, unambiguously reserved to the developer the right to designate a project architect for all buildings, structures and other improvements on each lot, and this Court has found nothing in the facts or circumstances of the transaction that voids this restriction either as to the DeWolfs or as a matter of public policy, I must find that Paragraph 4 is enforceable in its entirety against the DeWolfs. In addition, since Usher Cove Corporation validly exercised the right to amend reserved to it in the Covenants, I necessarily find that the DeWolfs must conform their residence at Case Farm Estates to the common architectural style embodied in the work of Edward O. Ekman, which style is the unmistakeable common theme of the Case Farm Estates development.

### C. *Presumed Approval of Plaintiff's Plans and Specifications Pursuant to Paragraph 34*

■ Plaintiff next contends that, despite her failure to utilize the designated project architect to draw her plans, Usher Cove's failure to act on the DeWolfs' September 30, 1987 request for approval of the plans as drawn is a clear violation of Paragraph 34 of the Covenants, which requires the developer to act upon such a request within 30 days, and thus the plans are presumed approved. There is simply no merit in this argument. On its face, Paragraph 34 also provides, "... however, no action shall be taken by or on behalf of the person or persons submitting the written request which violates any of these Covenants and Restrictions." Since the DeWolfs plans were not drawn by Ekman, in clear violation of the Covenants, as amended, Usher Cove was under no duty at all to respond to the DeWolfs' submittal. Fur-

ther, since this Court has held the requirement of utilizing the designated project architect to be valid, Usher Cove's withholding of approval on the strength of the DeWolf's noncompliance with this restriction is clearly objective, honest and reasonable, as required by the weight of authority. *See, e.g., Souza v. Columbia Park and Recreation Ass'n, Inc.,* 70 Md.App. 655, 522 A.2d 1376 (1987); *Seabreak Homeowners Assoc., Inc. v. Gresser,* 517 A.2d 263, as amended (Del.1986); *Donoghue v. Prynnwood Corp.,* 255 N.E.2d 326, 329 (Mass.1970).

### D. *Tolling of the Time Period Associated With Defendant's Preemptive Repurchase Right Pursuant to Paragraph 9*

Paragraph 9 of the Covenants provides that, if the owner of a lot at Cove Farm Estates does not commence construction of the main residence within three years of the date of purchase of the lot, the developer has sixty days in which to exercise the right to repurchase the lot for a fixed price. Plaintiff now argues that equity requires that the calculation of this three year period not include the time between the submission of her plans for approval and the date that this Court files its opinion in this case.

■ This Court cannot agree that the three year period defined by Paragraph 9 should be tolled by plaintiff's September 30, 1987 submission of proposed building plans to the Ekman Corporation for approval. Plaintiff simply cannot in equity point to its faulty submission as justification for relieving herself of the consequences of the very contract whose terms the submission violated.

A somewhat different issue is presented, however, by the question, not precisely raised by plaintiff, of whether the running of the three year period should be tolled by the filing of this legal action. Although I can find no cases exactly on point, two cases based on Georgia law, *Wesley–Jessen, Inc. v. Armento,* 519 F.Supp. 1352 (N.D.Ga.1981) and *Coffee System of Atlan-*

ta v. Fox, 227 Ga. 602, 182 S.E.2d 109 (1971), provide some insight into the problem. In both cases, employers brought suit against former employees for breaches of noncompetition agreements of limited duration entered into as part of their employment contracts. An issue raised in each action was whether the restrictive covenant being litigated was tolled during the pendency of the lawsuit. In *Coffee System*, the Supreme Court of Georgia held that litigation over a noncompetition covenant does not toll the running of the noncompetition period. In reaching this conclusion, the court reasoned that, "Such an extension would in effect rewrite the one year feature of the agreement. Courts do not make contracts for the parties. The contingency of litigation could have been provided for in the agreement, but was not." Underlying the court's opinion was its concern that any other rule would enable employers to derive more benefit from the contract of employment than they had originally bargained for simply by bringing suit against employees bound by such restrictions. This same principle was later adopted by the federal district court in *Wesley–Jessen*, although the latter opinion specifically disapproved a contingency clause of the kind suggested in *Coffee Systems*.

Certainly the reasoning of the Georgia Supreme Court is appealing. Allowing the pendency of this litigation to toll the running of the three year right to repurchase would confer a benefit not originally bargained for upon the party bringing this action and could conceivably unfairly disadvantage the defendant. On the other hand, the situation presented by this case differs from that confronted by the Georgia court is several significant aspects. Unlike the Georgia cases, which were actions for damages and injunctive relief aimed at securing redress for direct violations of the time-limited restrictive covenant, the case at bar is a declaratory judgment action in which the plaintiff is seeking clarification of other provisions of her agreement with defendant that bear directly on her ability to comply with the three year construction deadline. It seems to this Court that this plaintiff, who has been struggling in good faith to commence construction within the three year time period but who has been blocked in this effort by the conflict presently before this Court, should not be penalized for taking the time to attempt to clarify, through litigation, the circumstances under which her building project will be approved to begin. Were plaintiff's suit frivolous or clearly brought for the purpose of delaying the fulfillment of her obligations under the Covenants, this Court might view the matter differently. Under these facts, however, I see no reason to penalize plaintiff for seeking to adjudicate her rights, especially where the immediate invocation of defendant's right to repurchase would, in effect, work a forfeiture against the plaintiff. Accordingly, this Court holds that the running of defendant's preemptive repurchase right is tolled for the pendency of this action. Since plaintiff purchased Lot No. 8 on October 25, 1985 and filed this action on May 10, 1988, I find that there will be five (5) months and fifteen (15) days left to plaintiff from the date of the issuance of this Opinion and Order in which to commence construction before defendant's preemptive purchase right matures.

### E. Validity of Defendant's Preemptive Repurchase Right

Finally, plaintiff argues that Paragraph 9 of the Covenants is invalid to the extent that it fixes an artificial repurchase price of purchase price plus 10% per year. Instead, plaintiff states further, a provision like that in Paragraph 9 fails as "an unreasonable restraint on the alienation of land if the price of the forced sale is fixed and bears no reasonable relation to the property's fair market value at the time of the repurchase." Pl. Post–Trial Brief, p. 18.

In support of its position, plaintiff has cited to this Court much apposite precedent which defendant has made no effort to refute. *See Metropolitan Transportation Authority v. Broken Realty Corp.*, 67 N.Y.2d 156, 492 N.E.2d 379 (1986); *Smith v. Mitchell*, 269 S.E.2d 608 (N.C.1980); *In-*

*glehart v. Phillips*, 383 So.2d 610 (Fla. 1980). On the strength of this authority, this Court thinks it clear that, while preemptive repurchase rights are not per se invalid, *see, e.g., Belliveau v. O'Coin*, 557 A.2d 75 (R.I.1989), and may serve the valid purchase of enabling the original grantor of land to retain control over its development, such rights are only upheld if reasonable as to duration, price and purpose. While the preemptive right in this case is of eminently reasonable duration and is for the valid purpose of enabling Usher Cove to retain control of the development of its planned community, the fixed repurchase price provision of the covenant has been struck down repeatedly as an unreasonable restraint on the free alienation of land, as seen in the cases cited. Since, however, the circumstances of this case make it impossible to return the parties to the status quo that prevailed nearly four years ago when they first struck their bargain, this Court orders the following equitable relief: Defendant's preemptive repurchase right is upheld as to everything but the repurchase price, which must be set in relation to Lot No. 8's fair market value at the time of the repurchase. The fair market value is further defined as the bid which the DeWolfs, having determined to convey, sell or transfer title to the lot after the running of the three year period, have decided to accept from a bona fide third party, unrelated to the DeWolfs either personally or professionally. This bid must be an actual bid submitted in writing by an interested purchaser and able to be verified by Usher Cove Corporation.

For the foregoing reasons, this Court holds that the Covenants and Restrictions imposed upon Case Farm Estates, as amended, are valid and enforceable as to the plaintiff, Nancy W. DeWolf, with the single exception of the repurchase price fixed for Lot No. 8 by Paragraph 9 of the restrictions. In keeping with this finding, plaintiff has five (5) months and fifteen (15) days from the date of this Opinion and Order to commence construction of her residence on Lot No. 8, which residence is to be designed by Edward O. Ekman, designated project architect. Should plaintiff fail to meet this deadline, defendant may exercise its preemptive repurchase right, subject to the requirement that the repurchase price be set as the fair market value of Lot No. 8, as defined in this opinion, at the time of its intended conveyance. So ordered.