CAROUSEL SNACK BARS OF MINNE-
SOTA, INC., Appellant,

v.

CROWN CONSTRUCTION COMPANY
and
Purple Cow of Scranton, Inc.

No. 18250.

United States Court of Appeals,
Third Circuit.

Argued Nov. 6, 1970.

Decided March 9, 1971.

Henry C. McGrath, Welles & McGrath, Scranton, Pa., for appellant.

Robert Davis Gleason, Gleason, Gleason, Gleason, DiFrancesco & Shahade, Johnstown, Pa., for Crown Construction Co.

Larry H. Slass, Philadelphia, Pa. (Techner, Rubin & Shapiro, Philadelphia, Pa., on the brief), for Purple Cow of Scranton, Inc.

Before BIGGS, VAN DUSEN and ROSENN, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

This is an appeal from a judgment of the United States District Court for the Middle District of Pennsylvania determining that the contemplated use of the premises at Viewmont Mall Shopping Center by defendant Purple Cow of Scranton, Inc. (Purple Cow) did not violate the lease agreement between plaintiff, Carousel Snack Bars of Minnesota

(Carousel), and defendant Crown Construction Company (Crown), and that plaintiff Carousel was not entitled to injunctive relief.[1]

Plaintiff Carousel entered into a lease agreement with Crown on August 30, 1967, concerning a portion of the covered mall known as the Viewmont Mall Shopping Center, which is located partly in Dickson City and partly in Scranton, Pennsylvania. Article XXXII of the lease provided that:

Article XXXII—Notwithstanding any other terms or conditions on this Lease, the parties hereto agree as follows: * * *

2. Article IX, "Use of Premises," Section 1, is modified to the extent of the addition of the following provision:

It is agreed that the tenant shall be sole operator in the center of a kiosk, a standup-type snack bar, restaurant or food store that has as its principal business the sale of such items as popcorn, caramel corn, candy floss, soft drinks, soft ice cream, coffee, hot chocolate, milk, snow cones, hot dogs, and pastries; other tenants in other types of stores may sell certain of such items but not as their principal business. It is understood, however, that the foregoing restrictions shall not prevent any candy store from handling candy as its principal item, or any bakery from handling pastries as its principal item, nor the operation of a delicatessen so long as it does not sell hot dogs ready-to-eat, as its principal or major item. It is further understood that the foregoing restriction does not apply to Sears, Roebuck Company, J. C. Penney Company, Thrift Drug Company, W. T. Grant and Giant Markets, or other department stores, junior department stores, drug stores, variety stores and supermarkets whose leases permit the handling of all types of merchandise without limitation, provided any competing operation by said businesses would be conducted within their leased premises. * * *

On March 17, 1969, defendant Crown entered into a written lease agreement with Purple Cow, leasing to that company a portion of the Mall. Article IX of this lease provided that:

1. The demised premises shall be occupied and used solely for the purpose of operating a conventional type of restaurant and a combination cafeteria with counter and table facilities.

Carousel had notified Crown by letter dated March 11, 1969, that it considered the proposed Purple Cow establishment to be in violation of the exclusive use rights afforded it under Section 2 of Article XXXII of its lease. Plaintiff failed to dissuade Crown and Purple Cow from their plans and subsequently instituted this action for injunctive relief.

Plaintiff claims that Article XXXII of the lease was violated by the agreement between defendants because the contemplated Purple Cow establishment is a "stand-up type" restaurant and because the principal business of Purple Cow will be the sale of products covered by Section XXXII.

The defendants' contract is in violation of the agreement between plaintiff and Crown if Purple Cow is *both* (a) " * * * a kiosk, stand-up type snack bar, restaurant or food store," and (b) an establishment that has "as its principal business the sale of such items as popcorn, caramel corn, candy floss, soft drinks, soft ice cream, coffee, hot chocolate, milk, snow cones, hot dogs, and pastries. * * *" If Purple Cow falls within the description of neither phrase (a) nor phrase (b) above, or if it can be described by only one of the two phrases, then its operation does not violate Article XXXII of Carousel's lease.[2]

1. Carousel Snack Bars of Minnesota, Inc. v. Crown Construction Co., and Purple Cow of Scranton, Inc., No. 69–146 (M.D. Pa., August 27, 1969).

2. The district court found that the Purple Cow operation was not covered by the wording of phrase (b) and stated that "while there may be some similarity in

Only if Purple Cow is an operation that can be described by *both* phrases "(a)" and "(b)" is Article XXXII violated. However, we have concluded that the Purple Cow operation is covered neither by phrase (a) nor phrase (b) and that, as a consequence, the district court judgment must be affirmed since Carousel is not entitled to injunctive relief.

The record supports the conclusion that Purple Cow is not "* * * a kiosk, stand-up type snack bar, restaurant or food store" within the meaning of Section XXXII.

Article IX of the contract, entitled "Use of Premises" is helpful in determining exactly what was intended by the description, "* * * a kiosk, stand-up type snack bar, restaurant or food store." Article IX provides that "[t]he demised premises shall be occupied and used solely for the purpose of operating a snack bar for the sale of hot dogs, popcorn, and soft drinks."

Article XXXII apparently represents an attempt by the parties to protect Carousel from the competition of a snack bar where customers ordinarily order, receive, and eat their food while on their feet. Purple Cow's contemplated restaurant is not such an operation. The evidence indicates that, although customers are required to order and pick up their food at the counter, they are expected to and will sit down while consuming their food.[3] There will be seating for 102 people, including 60 chairs located at 15 tables and 42 single chairs with small trays attached located along the walls of the restaurant.[4] Carousel, on the other hand, has a 15-foot long stand-up eating ledge and only four tables and 16 chairs. We think a comparison of the menus of Carousel and Purple Cow is relevant to a determination of whether the latter is a stand-up snack bar. Purple Cow offers a choice of several complete meals and their menu is divided into categories under the headings "Breakfast," "Lunch & Dinner," "Salads," and "Dessert," indicating an expectation that patrons will order a complete meal which ordinarily would be consumed sitting.[5] Carousel, on the other hand, offers a much less complete menu which is not divided into meals and which is made up primarily of

the physical layouts of Carousel and Purple Cow, the character of the food business to be carried on by each is decidedly dissimilar."

3. The president of Purple Cow testified that except for the ice cream, the food is eaten on the premises at the York restaurant and the same is expected to occur at Scranton.

4. Purple Cow will occupy an area of 3300 square feet. Carousel occupies an area of 1000 square feet. Findings of fact Nos. 16, 17, in memorandum opinion of district court, *supra.*

5. The parties stipulated to the menus of both establishments. The menu of Purple Cow, except for beverages, for its Scranton operation, is as follows:

Breakfast:
| | |
|---|---|
| Juices | .15 for orange |
| Coffee, tea and milk | .15¢ |
| Donuts | .10¢ |
| Danish Pastry | .25¢ |
| Toasted English Muffins | .25¢ |
| Cottage Cheese | .35¢ |
| Fruit Cup | .35¢ |

Lunch & Dinner Menu
| | |
|---|---|
| Hamburgers | .45¢ |
| Hog Dogs | .35¢ |
| Pork Roll | .35¢ |
| Grilled Cheese | .45¢ |
| Ham & Cheese | .70¢ |
| Fish Cake | .35¢ |
| Fried Clams | .95¢ |
| French Fries | .25¢ |

Salads
| | |
|---|---|
| Tuna | .60¢ |
| Fruit | .75¢ |

Dessert
Hard Ice Cream
| | |
|---|---|
| Cones | .30¢ |
| Sundaes | .55¢ |
| Milk Shakes | .45¢ |
| Ice Cream Sodas | .40¢ |
| Pie Ala Mode | .50¢ & .25¢ |
| Variety of Pastries | .35¢ |
| Pies | .25¢ |

The evidence also indicates that Purple Cow will serve its food on paper plates with plastic knives and forks, whereas Carousel apparently serves its food on napkins.

food commonly thought of as snacks and often eaten while standing or walking.[6]

■ At best, it is ambiguous whether this is a "stand-up type" operation within the meaning of the lease agreement. Pennsylvania law requires that restrictive covenants in leases must be construed strictly and that any ambiguity be resolved against the party benefitting from the restrictions. Great Atlantic & Pacific Tea Co. v. Bailey, 421 Pa. 540, 220 A.2d 1 (1966); see also Siciliano v. Misler, 399 Pa. 406, 160 A.2d 422 (1960); Sandyford Park Civic Ass'n v. Lunnemann, 396 Pa. 537, 152 A.2d 898 (1959); Jones v. Park Lane for Convalescents, 384 Pa. 268, 120 A.2d 535 (1956). In these circumstances, it is clear that Carousel has not borne its burden of proof on this issue.

Although not necessary to our decision in this case in light of our disposition of Carousel's first argument, we also hold that Purple Cow will not have as its principal business the sale of "such items" as those enumerated in Article XXXII of the lease agreement.

■ Whether Purple Cow sells the covered products as its principal business depends on whether the percentage of Purple Cow's total sales represented by these items exceeds 50%.[7] The district court properly used the figures from Purple Cow's "similar" facility in York as a basis for the computation.[8] An analysis of these figures indicates that the items which clearly overlap are hot dogs, soft drinks, coffee and pastries, all of which amount to approximately 30.4% of the total sales of Purple Cow. Thus, whether or not hard ice cream, making up 28.3% of Purple Cow's total sales, should be considered as an item "such as * * * soft ice cream" is critical to a determination of whether Purple Cow has as its principal business the sale of the products covered by Article XXXII.

■ Carousel sells only soft ice cream and it is "soft ice cream," not "ice cream" that is listed in the contract. Purple Cow sells only hard ice cream. Plaintiff's president testified that the basic difference between soft ice cream

6. The menu of Carousel is as follows:
   Bar-B-Que ..................... .50
   Coney Island ................... .40
   Hot Dog ....................... .30
   Rolls ......................... .15
   Donuts ....................... .10
   Coffee .................. .10 & .15
   Milk ......................... .15
   Coke .............. .15 & .20 & .30
   Root Beer ........ .15 & .20 & .30
   Sprite ........... .15 & .20 & .30
   Fresca ........... .15 & .20 & .30
   Tab .............. .15 & .20 & .30
   Tahitian Treat .... .15 & .20 & .30
   Orange ........... .15 & .20 & .30
   Carbonated Coke
     Ice ........... .15 & .20 & .30
   Carbonated Orange
     Ice ............. .15 & .20 & .30
   Popcorn .......... .15 & .25 & .35
   Butter Corn ............ .30 & .50
   Caramel Corn .... .30 & .50 & .90
   Floats ........................ .35
   Cones .................. .15 & .20
   Cotton Candy ........... .15 & .25

7. *Cf.* Sun Drug Co. v. West Penn Realty Company, 439 Pa. 452, 268 A.2d 781 (1970). We do not agree with the dis-

trict court's determination that "[t]o attempt to include the sale of such standard and related restaurant fare as soft drinks, coffee, hot chocolate or milk within the proscription of the covenant would be illogical and unrealistic." These drinks were specifically listed in the contract and must be included in a computation of the contract items sold by Purple Cow.

8. The district court found that the "dollar volume percentage of sales" at the York facility is as follows:
   Hamburgers-cheeseburgers ... 31.2%
   Hotdogs, French Fries, Fish
     and Grilled Sandwiches .... 15.1%
     (Hot Dogs represent ⅓ of
     15.1% figure)
   Beverages (soft drinks) ...... 14.6%
   Coffee and pastries ........ 10.8%
   Ice Cream
   Sundaes .................... 5.7%
   Milk Shakes ............... 5.9%
   Ice Cream Sodas ........... 3.3%
   Ice Cream Cones .......... 10.5%
   Plates of Ice Cream ......... 2.9%
   Finding of fact No. 13, district court opinion, *supra.*

and hard or conventional ice cream is their relative amounts of butter fat and that each state sets a percentage figure of butter fat content which must be met before a product can be called ice cream, instead of soft ice cream or ice milk. *See also* testimony of the president of Purple Cow at N.T. 74–75. The parties stipulated that the product sold at Carousel "contains six percent butter fat, and that by statutory definition in the Commonwealth of Pennsylvania this is known as "ice milk" * * *." The president of Carousel himself noted that there is a distinct flavor difference between soft and hard ice cream.[9] The district court found that "[t]hese products are essentially different in composition, texture and ingredients and cannot be considered as similar in the circumstances of this case." We cannot say the trial court's finding of fact is clearly erroneous, particularly in light of the Pennsylvania rule that restrictive covenants are to be construed strictly with all ambiguities being construed against the party benefitting from the restriction. *See* Great Atlantic & Pacific Tea Co. v. Bailey, *supra*. Therefore, we accept the view that hard ice cream is not an item "such as * * * soft ice cream"[10] and that the percentage of ice cream sold by Purple Cow should not be included in the computation of products sold by Purple Cow which are covered by Article XXXII. Since the total of such products does not reach 50%, Purple Cow has not made the sale of the items covered by the contract a "principal" part of its business.

Carousel has failed to establish either that (a) Purple Cow is "* * * a kiosk, stand-up type snack bar, restaurant, or food store" or that it "has as its principal business the sale of such items as popcorn, caramel corn, candy floss, soft drinks, soft ice cream, coffee, hot chocolate, milk, snow cones, hot dogs, and pastries." Consequently, the judgment of the district court will be affirmed.

9. Q. They're [soft and hard ice cream] certainly not similar in taste, are they?
A. I'm a vanilla ice cream man, and I know that there's a significant difference in vanilla ice cream.
Q. Say like between Breyer's vanilla and the ice cream you sell; a distinct difference?
A. Well, say between four and five different suppliers in this area. There's a distinct flavor difference. There is a flavor difference between soft ice cream mix and those various flavors of vanilla that I so dearly love.
Q. There is a total difference when you bite into it, isn't there?
A. There certainly is.

10. In Reeve v. Hawke, 37 Del.Ch. 25, 136 A.2d 196, 198 (1957), the Delaware Chancery Court was faced with a suit by lessee, who operated a Tastee-Freez establishment, against the operator of a diner. Lessee claimed that the defendant-lessor violated a contract between them providing that the lessor would not rent or lease land near the Tastee-Freez "for the purposes of conducting a business similar to that authorized by the aforesaid Indenture of Lease. The diner was erected on land owned by the lessor, was located near the Tastee-Freez, and sold hard ice cream. In the initial agreement between the diner and the lessor, the diner had reserved the right to sell "ice cream or allied products in the regular course of his diner business." The court found that the diner's owner reasonably assumed that the Tastee-Freez was entitled to be protected solely in dispensing Tastee-Freez soft ice cream. In concluding that Tastee-Freez was only entitled to protection in the dispensing of soft ice cream, the court stated: "There is no doubt in my mind that soft ice cream as a foodstuff differs substantially from conventional or hard ice cream. Admittedly the two products contain essentially the same ingredients, but they are processed to different consistencies at different temperatures by different machinery, and they are dispensed in different fashion. People in the ice cream industry as well as the general public look on the two products as separate and distinct foodstuffs, a fact which Reeve [Tastee-Freez] concedes." *Id.*, 136 A.2d at 201. We note that Purple Cow plans to carry 24 flavors. There is no evidence that Carousel will carry more than the two or three flavors customarily dispensed by soft ice cream machines. We also note the fact that cones at Purple Cow will cost considerably more than cones at Carousel. These facts support our belief that the two establishments are selling essentially different products.