**ALMACS INC., Plaintiff,**

v.

**Gerald DROGIN, in his capacity as General Partner of Wamp Associates, L.P., a Limited Partnership and F.W. Woolworth Co., d/b/a Rx Place Store, Defendants.**

**Civ. A. No. 90–0492P.**

United States District Court, D. Rhode Island.

June 28, 1991.

Stephen A. Rodio, Providence, R.I., for plaintiff Almacs Inc.

Richard A. Boren, Providence, R.I., for defendant Gerald Drogin.

Joseph V. Cavanagh, Jr., Providence, R.I., for defendant F.W. Woolworth Co.

## OPINION

PETTINE, Senior District Judge.

Almacs, the plaintiff in this case, is the owner and operator of a chain of supermarkets in Rhode Island and southeastern Massachusetts. It has rented space and operated a store in the Wampanoag Mall Shopping Center ("Mall") in East Providence, Rhode Island since 1967. The lease between Almacs and Wamp Associates, the current owners of the Mall, contains restrictive covenants placing limits on the businesses of other Mall tenants. Restrictive covenants such as the one in the Almacs lease are common and "their importance has perhaps been enhanced by the rise of the modern shopping center with its basic plan of a grouping of basically noncompetitive and diversified, but interrelated, businesses designed not to serve just one need but as many needs of the consumer as is feasible within the economic framework of the shopping center." 97 A.L.R.2d 4, 11 (1964). Almacs coexisted peacefully with its neighbors in the Mall until 1990, when it first learned that F.W. Woolworth Co. ("Woolworth"), under the name of Rx Place, would be opening a "deep-discount"

drug store [1] in a then vacant space in the Mall.

Almacs alleges that the defendant Gerald Drogin, general partner of Wamp Associates ("Wamp"), has breached his lease with Almacs by entering into the lease with Rx Place. Almacs asks this Court to permanently enjoin Wamp from leasing the property to Rx Place and to enjoin Rx Place and Woolworth from any further interference with Almacs' contractual relations with Wamp.

After a five day trial before this Court, I conclude that Rx Place's tenancy does not violate the terms of the lease and that Almacs, therefore, is not entitled to the requested relief.

## I. FACTS

On August 24, 1967, the predecessors in interest of Wamp and Almacs entered into a lease agreement ("Almacs lease") for approximately 21,209 square feet of space in the Mall. Almacs has continuously operated a supermarket at the Mall since 1967 under the terms of the Almacs lease and extensions thereof. The lease contains three provisions that are relevant to this case. All of these provisions are in Article X of the lease. Section 1 of Article X is the "permitted uses" portion of the lease; it sets out the types of items that Almacs may sell, but does not grant Almacs an exclusive right to sell those items. Sections 2 and 3 are restrictive covenants limiting the activities of other Mall tenants.

Section 2 reads:

It is expressly understood that the operator or operators of any department store or stores in the Shopping Center may display and sell such food or food products as are part of the department store's general business operations, provided, however, that the sales area devoted to the display and sale of such food and food products in any such store shall not exceed 2,500 square feet, of which not more than 1,250 square feet may be used for the display and sale of meat or frozen foods. For the purpose of this paragraph the term "department store" shall mean a store similar to stores presently operated by Warwick Shoppers World, Grant's or The Outlet Company in the southern New England area.

Section 3 reads:

No store in the Shopping Center except that of the Tenant shall ... (b) sell, as the major part of its activity, food and food products, dry groceries, fruit and vegetables, but this restriction shall not prevent: (i) the sale of food for consumption on the premises by way of a restaurant or otherwise (ii) the operation of a delicatessen and/or bakery shop (iii) the operation of a Class "A" liquor license (iv) the operation of a tavern or a bar and (v) the sale of candy, doughnuts, cookies, crackers, nuts, peanuts, chocolates, gum, ice cream and related items.

On April 16, 1990, Wamp and Rx Place entered into a lease agreement for approximately 30,000 square feet of space in the mall. The Rx lease with Wamp allows the premises to be used for the "retail sale of health and beauty aids, hair goods, candy, cosmetics, greeting cards, stationery, housewares, paper goods, gift wrap, household chemicals and prescription drugs, video sales and rentals and other related items as customarily sold in the Rx Place store in the geographical area." Moreover, the lease requires Wamp to renovate the premises prior to Rx Place's occupancy. By June of 1990, Wamp had hired a contractor and begun demolition and renovation. By the end of August Wamp had expended over $300,000 for partial renovation.

Some time in August or September of 1990, Greg Mays, the current president of Almacs telephoned Marvin Williams of Wamp to inquire whether Rx Place was coming into the Mall. When Mr. Mays received confirmation, he objected. His objection was followed a few days later by a formal letter of protest to Wamp complaining that Rx Place, in violation of the Al-

---

**1.** Deep discount drug stores are a fairly recent phenomena growing out of traditional drug stores. These stores stock a larger assortment of merchandise than typical drug stores and emphasize their "everyday low prices."

macs lease, would be selling as "a major part of its activity" food, food products and dry groceries and that it engaged in cart price comparisons[2] with Almacs. Receiving no satisfaction, two weeks later, Almacs filed this suit.

The trial before this Court began on May 2 and continued through May 8, 1991. In the afternoon of the first day of trial, the Court took a view of Rx Place stores in Warwick, Rhode Island and Swansea, Massachusetts, as well as a view of the Wampanoag Mall including the Almacs Store there and the proposed site of the Rx Place. Finally, the Court was escorted through a CVS drugstore across the street from the Mall.

Both sides presented expert testimony regarding the definitions of food, food products, and dry groceries. There was a general consensus that food and food products may be defined as any non-medicinal edible products meant to be consumed by human beings. With regard to the definition of "dry groceries," the parties agreed that the categorization found in the Supermarket Business Magazine's Consumer Expenditure Study provides the relevant information.

Plaintiff's expert, Howard S. Dubin, computed the sales percentages for categories of goods using the Consumer Expenditure Study for the Rx Place in Swansea in order to show that food, food products and dry groceries are "the major part" of Rx Place's business for the purposes of Section 3 of Article X of the lease.[3] In the food and food products category, he included such items as candy and nuts that are arguably excludable under Section 3 of the Almacs lease. His final figures were as follows: food and food products—22.29%,

dry grocery/non-foods—12.62%, health and beauty aids—30.72%, general merchandise—29.08% and pharmacy—5.29%. Thus, the total for food, food products and dry grocery was 34.91%. Although Mr. Dubin, based on the summary in the Consumer Expenditure Study, separated health and beauty aids from pharmacy items, the body of the study lists prescription drugs under the health and beauty aids category. If those categories are combined, the total is 36.01%.

## II. DISCUSSION

Almacs asks this Court to focus on the intent of the parties and argues for a very broad interpretation of the lease. It asks the Court to essentially disregard the express language of the lease and instead consider only that the parties intended to exclude all direct competition and, thereby, create a compatible tenant mix in the mall. This Court must, however, look to Rhode Island law for guidance as to how to interpret the restrictive covenants.

The general rule in Rhode Island governing the construction of restrictive covenants is "essentially the same as those applicable to any contract or covenant." *DeWolf v. Usher Cove Corp.*, 721 F.Supp. 1518, 1527 (D.R.I.1989). A court, therefore, must consider the " 'oft-repeated maxim that restrictive covenants are to be strictly construed in favor of the free alienability of land while still respecting the purposes for which the restriction was established.... As in statutory construction [the words in the covenant] should be given their plain and ordinary meaning unless a contrary intent is discernible from the face of the instrument.' " *Id.* at 1527–28 (quoting *Lancellotti v. Lancellotti*, 481 A.2d 7,

**2.** Rx Place conducts cart price comparisons by filling two shopping carts with identical products. One cart has items labelled as being from Rx Place; the other from a competing store. A sign indicates the overall savings when the items are purchased at Rx Place. Rx Place has a store in Swansea, Massachusetts, that has done cart price comparisons with a nearby Almacs.

**3.** Mr. Dubin based his calculations on the Swansea store because that store was the newest one

in the area and, he therefore concluded, that it was the most representative of what the new store in the Wampanoag Mall would be like. Defendants, on the other hand, contend that the Warwick store is more established and represents what the new store will be like after its first year of operation. As will be pointed out *infra*, it was unnecessary for this Court to determine which store was the more applicable model because, even accepting Almacs' figures, it does not prevail.

10 (R.I.1984)). "Stated differently, where the language of a restrictive covenant is unambiguous on its face, there is no room for interpretation and the plain meaning rule applies to its construction. Where there is ambiguity, however, the intention of the parties as shown by the covenant governs, subject to the further rule that the ambiguity is to be resolved in favor of an unrestricted use." *Id.* at 1528.

■ Almacs cites to *Hill v. M.S. Alper & Son, Inc.,* 106 R.I. 38, 256 A.2d 10 (1969), for the proposition that it is not necessary, under Rhode Island law, to find ambiguity before considering the intent of the parties. The cited language in *Hill,* however, undermines Almacs' contention:

> In interpreting [an] instrument it is basic that the intention of the parties must govern if that intention can be *clearly inferred from its terms* and can be fairly carried out consistent with settled rules of law. In ascertaining what the intent is *we must look at the instrument as a whole* and not some detached portion thereof. And, although there is no ambiguity we will nonetheless consider the situation of the parties and the accompanying circumstances at the time the contract was entered into, *not for the purpose of modifying or enlarging or curtailing its terms, but to aid in the interpretive process and to assist in determining its meaning. Id.,* 256 A.2d at 15 (emphasis added).

The import of *Hill* is that intent must be gleaned from the face of the document and cannot be used to expand or limit the rights of the parties as defined by the document. Intent is used to aid in the interpretation of words, not rights.

Other jurisdictions concur in this approach and note that "any ambiguity be resolved against the party benefitting from the restrictions." *Carousel Snack Bars, Inc. v. Crown Constr. Co.,* 439 F.2d 280, 283 (3rd Cir.1971); *see Genovese Drug Stores Inc. v. Connecticut Packing Co.,* 732 F.2d 286, 289 (2d Cir.1984) ("[R]estrictive covenants, especially those endeavoring to restrict commercial activity for competitive advantage, are not favorites of the law, those who seek a benefit from them must expect that their terms and effectiveness will be strictly construed."). Finally, "[w]hile [even] a covenant or agreement by a lessor not to lease the retained property for the purpose of conducting a business in competition with the lessee is legal and valid, such a covenant must be positively expressed and, being in the restraint of trade, must be strictly construed." *Norwood Shopping Center, Inc. v. MKR Corp.,* 135 So.2d 448, 449 (Fla.App.1961).

Restrictive covenants in shopping center leases are generally of two types: those restricting "types" of businesses and those restricting the sale of either designated items or designated classes of items. 97 A.L.R.2d at 13. The Almacs lease is the second type; it restricts other stores from selling certain designated classes of items.

> [A] covenant prohibiting the sale of designated articles, or a designated class of articles, *will be enforced according to its terms,* if violated, regardless of the similarity, or lack of similarity, between the competing lessee's business and the covenantee's business, regardless of the relationship of the sale of such articles to the nature of the competing lessee's business, and *regardless of the degree of competition,* actual or potential, arising from the sale of such articles by the competing lessee and the covenantee. *Id.* at 65 (emphasis added).

The aforementioned principles provide the basis for my analysis of the disputed sections of the Almacs lease.

## A. *Section 2 of the Almacs Lease*

■ Article X, Section 2 of the lease limits the sale of food and food products in department stores in the Mall to 2,500 square feet. Almacs has two concerns with regard to this section: the definition of the term "department store" and the applicability of the square footage requirement.

Almacs first contends that the term "department store" is ambiguous and, therefore, that this Court should look to the spirit of the lease and find that Rx Place is the "modern successor to the department

store." (T. 5/8/91 at 52). This contention is bolstered by the fact that deep discount drug stores did not exist when the lease was drafted and therefore, such stores could not have been specifically provided for in the lease. Defendants respond that Rx Place is not a department store because "conventional department stores" are large stores divided into separate departments selling a variety of goods, the major portion of which is apparel. (T. 5/8/91 at 43–47) (Testimony of Howard L. Green).

Defendants presented Dr. Green's definition as an expert opinion. Comparing his definition to those found in various cases, this Court finds that there is ambiguity with regard to the meaning of the term "department store." The cases draw various distinctions. First of all, there is a distinction to be made between conventional department stores and discount stores. *See In re City Stores Co.,* 9 B.R. 717, 720–21 (S.D.N.Y.1981). There are "retail drug department store[s]," *Save–Rite Drug Stores Inc. v. Stamm,* 58 N.M. 357, 358, 271 P.2d 396, 396 (1954); there are department stores defined as stores "operat[ing] a number of departments for the sale of hard and soft goods and miscellaneous merchandise and service," *In the Matter of Federated Department Stores Inc. and Allied Stores Corp.* (available on Westlaw, FBKR–FDS database: Camp 824), 1990 Bankr. LEXIS 901, at 10 (S.D. Ohio, April 27, 1990); there are even "supermarkets that resemble small department stores," *30–88 Steinway Street, Inc. v. H.C. Bohack Co., Inc.,* 65 Misc.2d 1076, 319 N.Y.S.2d 679 (1971); and drug stores that "are department stores to a greater or less[er] degree." *Crest Drug Store Inc. v. Levine,* 142 N.J.Eq. 652, 61 A.2d 190, 192 (1948).

In resolving this ambiguity, "the intention of the parties as shown by the covenant governs." *DeWolf,* 721 F.Supp. at 1528. In this case, the lease defines the term "department store" as "a store similar to stores presently operated by Warwick Shoppers World, Grant's, or The Outlet Company in the southern New England

area." The stores mentioned in the lease indicate that the parties to the lease had a broad range of department stores in mind. Dr. Green testified that The Outlet Company was a more upscale store than Grant's and carried more style and fashion merchandise. (T. 5/8/91 at 45). Although the Rx Place has little in common with a "conventional" department store like The Outlet Company, Neiman–Marcus, or Macy's, an analogy can be drawn between Rx Place and a store like Grant's or K–Mart. After viewing Rx Place stores, this Court has little doubt that although the stores are nothing like the upscale department stores mentioned above, they do resemble non-conventional department stores like Grant's. I, therefore, find that considering the intent of the parties, Section 2 of Article X of the lease applies to Rx Place. In other words, Rx Place is a "department store" under the terms of the lease.

■ Almacs' second contention is that the 2,500 square foot limitation on food and food products in any "department store" should not be applied as it is written. It argues that the restriction should be applied as it was *intended* to apply to Warwick Shoppers World, the department store designated for the mall at its inception. Warwick Shoppers World occupied 100,000 square feet. Almacs thus argues by converting the square footage requirement into the appropriate percentage that the restriction was meant to limit *any* store's display of food and food products to 2.5% of the total square footage of the store. It notes that because the Rx Place occupies 30,000 square feet, 2,500 square feet of food and food products is closer to 10% of the total space occupied by the store and therefore violates the lease provision. This argument, however, is without merit. There is no ambiguity in the term "2,500 square feet." Percentages of space are used elsewhere in the lease.[4] If the parties had wanted to designate a percentage of space rather than a square footage limitation, they could have easily done so. I will, therefore, give the term "2,500 square feet" its "plain and ordinary meaning."

---

**4.** Percentages are mentioned on pages 8, 13, 25, 34, 35 and 37.

Rx Place has stipulated that in the event this Court finds that it is a department store within the meaning of the lease, it will limit its display of food and food products, as defined by Almacs, to 2,500 square feet. Having found that Rx Place is a department store as that term is used in the lease, I now will hold Rx Place to its word. To facilitate monitoring of compliance, this Court had hoped to receive an agreed statement from the parties with regard to the method that should be used to measure the square foot limitation. Having failed to receive such, I now order the parties to submit either an agreed statement or separate one page proposals for compliance. Once I receive them, I will make the system of measurement a part of my order.

With Rx Place's stipulation that it will limit its display of food and food products to 2,500 square feet, I find that the tenancy of Rx Place does not violate Section 2 of the Almacs lease.

### B. *Section 3 of the Almacs Lease*

■ Article X, Section 3 of the lease states that no other store may, as the major part of its business, sell food, food products and dry groceries. The principle issue regarding this section is the meaning of the phrase "the major part." Almacs has argued that "the major part" of the business should mean a plurality. In other words, it contends that by dividing all of the sales at Rx Place into five general categories, the category of food, food products and dry groceries equals 34.91% of the total sales. This figure is greater than the percentage of sales of any other category, as defined by Almacs, and, therefore, food, food products and dry groceries represents "the major part" in Almacs' view.

The defendants argue that "the major part" means the majority, i.e. greater than 50% of the total sales. Looking solely at the lease, the common sense meaning of "*the* major part" is "the majority." This view is supported by the use of the term in other contexts. *See Novak v. Apollo Printing and Thermography Inc.*, 562 N.E.2d 1305, 1307 (Ind.App.1990) (under federal labor law, "primary duty means the major part, or over 50 percent"); *Health Group Care Centers Inc. v. Pittsburgh*, 122 Pa.Cmwlth. 384, 552 A.2d 323, 326 (1988) (city ordinance reads "the major part (i.e., more than 50%)"); *Wikelund Wholesale Co. v. Tile World Factory Tile Warehouse*, 57 Ill.App.3d 269, 14 Ill.Dec. 743, 744, 372 N.E.2d 1022, 1023 (1978) (courts defining the major part of inventory for bulk transfer statute as "greater than fifty percent" of inventory); *see also Carousel Snack Bars*, 439 F.2d at 283 (whether certain products are the "principal business depends on whether the percentage of ... total sales ... exceeds 50%"). Given this precedent, and the common sense definition of the phrase, I find that "the major part," as used in the lease, means at least 50% of the total sales. Therefore, even accepting Almacs' calculations and its separation of health and beauty aids from prescription drugs, the category made up of food, food products and dry groceries does not represent "the major part" of Rx Place's business.

The parties also disagree about possible exceptions embodied within Section 3. The dispute centered on whether items such as candy, nuts, etc., should be deducted from the food and food products category. Because this Court finds that, even including the possibly excepted items, the major part of Rx Place's business is not the sale of food, food products and dry groceries, I need not reach this issue. I find that Rx Place does not violate Section 3 of the lease.

### C. *The Spirit of the Lease*

■ Almacs contends that strictly enforcing the restrictive clauses of the lease violates the spirit of the agreement. It argues that the parties actually intended to limit direct competition and that Rx Place is, in fact, a competitor. This, however, is unpersuasive.

First of all, the lease does not speak at all in terms of competitors or similar businesses; the lease merely limits categories of products. Second, assuming that I should look beyond the document, there

was scant evidence at trial regarding the intent of the parties. Finally, even if Almacs intended to limit competition, the lease would have to be interpreted in light of the intentions of *both* parties. *See Hanley v. Misischi*, 111 R.I. 233, 302 A.2d 79, 82 (1973). Almacs did not negotiate for nor receive a broad anti-competition provision.

Additionally, I do not believe that Rx Place's existence in the mall would violate the spirit of the lease even if it were to be construed as limiting direct competition. Almacs and Rx Place are not direct competitors. Although there is overlap in terms of the products that they sell, the primary identities of the stores are distinct. Almacs deals primarily in food whereas Rx Place concentrates on prescriptions and health and beauty aids. "Common sense dictates that no one could realistically attempt to do their marketing at [Rx Place] to the exclusion of a[n] [Almacs]-type operation, unless they were to subsist on a diet of snacks and soft drinks." *Schmitt Co. v. Phar–Mor and Action Industries*, No. 18–E–1984, slip op. at 7–8 (Ct. of Common Pleas, Erie County, Penn.1984).

In fact, there is even evidence that Rx Place would not detract from Almacs' business. Dr. Green testified that deep discount drug stores bring in customers from a ten mile radius, whereas supermarkets draw people from only a two to three mile area. He also testified that supermarkets and deep discount drug stores provide a good tenant mix, as evidenced by their co-existence in other shopping malls. It is quite possible, therefore, that Almacs will actually benefit by having Rx Place as a neighbor.

## CONCLUSION

Looking at the terms of the lease and giving due regard to the intent expressed therein, I find that the tenancy of Rx Place does not violate the restrictive covenants in the Almacs lease. I, therefore, deny the relief requested by Almacs. The parties must submit, within ten days of this opinion, jointly or separately, the compliance plan mentioned *supra*. I will then issue a supplemental order. Counsel in this case

have litigated vigorously and skillfully; my hope is that they can now turn their talents to charting a course of peaceful coexistence.

SO ORDERED.