## McDONALD'S CORPORATION, Plaintiff,

v.

## Louis RAPPAPORT and Marshall J. Cohen, Trustees of the Highlander Plaza Realty Trust, and Highlander Plaza Limited Partnership, Defendants.

### Civil Action No. 07–11397–JLT.

United States District Court,
D. Massachusetts.

Jan. 28, 2008.

Martin F. Gaynor, III, Nicholas D. Stellakis, Cooley Manion Jones LLP, Boston, MA, for Plaintiff.

Kelley A. Jordan–Price, Hinckley, Allen And Snyder, LLP, Boston, MA, Stephen F. Wasinger, Stephen F. Wasinger PLC, Royal Oak, MI, for Defendants.

## MEMORANDUM

TAURO, District Judge.

### Introduction

Plaintiff McDonald's Corporation ("McDonald's") asserts that the Highlander Plaza shopping center in Salem, Massachusetts, is violating a restrictive covenant contained in a ground lease between McDonald's and the shopping center. Specifically, McDonald's challenges Highlander Plaza's legal authority to lease space to an International House of Pancakes ("IHOP") franchisee for the operation of an IHOP on the premises. For the following reasons, (1) Plaintiff's request for preliminary and permanent injunctive relief is DENIED; (2) Plaintiff's breach of lease claim FAILS on the merits; and (3) Plaintiff's request for declaratory relief is DENIED.

### Factual and Procedural Background

Defendants own Highlander Plaza, a shopping center in Salem, Massachusetts, which has located within it a variety of stores and restaurants.[1] In 1993, McDonald's entered into a twenty-year ground lease with Defendants to open a new McDonald's restaurant in the shopping center,[2] and McDonald's has subsequently operated a restaurant there since 1994.[3] Larry Kimmelman ("Kimmelman") has owned the franchise since 1995.[4]

Article 4.F of the lease contains a covenant not to compete provision ("restrictive covenant" or "covenant"),[5] that restricts the landlord as follows:

### F. Covenant Not to Compete and Setback Restriction:

Landlord covenants and agrees that no property now or hereafter owned, leased or controlled, directly or indirectly, by Landlord or, if Landlord is a corporation, any subsidiary of Landlord, adjacent or contiguous to the Demised Premises or within two (2) miles of the perimeter of the Demised Premises (whether or not such property is subsequently voluntarily conveyed by Landlord) shall, during the term of this Lease and any extensions, be leased, used or occupied as a *so-called fast food restaurant, food service establishment, drive-in or walk-up eating facility* (hereinafter the "Restrictive Covenant")....[6]

---

1. Defendants Louis Rappaport and Marshall J. Cohen are the current trustees of the Highlander Plaza Realty Trust and the Highlander Plaza Limited Partnership. *See* Pl.'s Requests for Findings of Fact at 1[# 38] ("Pl. Findings of Fact"). The Realty Trust is the landlord for Highlander Plaza. *Id.*

2. *See* Pl.Ex. 1.

3. *See* Pl. Findings of Fact at 2.

4. *See* Transcript Day 1 at 108.

5. In commercial real estate, restrictive covenants or "non-compete clauses" enable tenants to limit, among other things, the landlord's ability to lease space to potential competitors.

6. *See* Pl.Ex. 1 at 4 (bold text in original, italics added). This court acknowledges that approximately six months after the Parties executed the lease, McDonald's prepared a "Covenant Not to Compete" to be filed with the registry of deeds. *See* Pl.Ex. 3; Defs.' Requests for Findings of Fact at 13[# 36] ("Defs. Findings of Fact"). Highlander signed the document, and it was recorded in the registry. *See* Pl.Ex. 3; Defs. Findings of Fact at 13. Counsel for Highlander on the transaction, however, did not review the document before

The restrictive covenant contains two exceptions, one of which is relevant to the instant matter: "[T]he Restrictive Covenant shall not apply to any use by the tenants listed and described on Exhibit C attached hereto and made a part hereof or to any exclusives or restrictions contained in the lease for any tenant or restrictions contained in the lease for any tenant so listed and described or any renewal or replacement thereof for the same or similar use."[7] Exhibit C lists other tenants and use clauses[8] under their respective leases with Defendants, including the names and use clauses for Taco Bell, The Ground Round, Jangs, Silver Star Pizza and Italian Restaurant, Shaws Supermarket, CVS, Caves Marchand, Jenny Craig, as well as Boston Chicken as a contemplated tenant.[9]

In the early summer of 2007, the Ground Round restaurant in Highlander Plaza closed for business.[10] Earlier in the year, on January 16, 2007, Defendants entered into an agreement to lease the Ground Round space to Salem Pancakes, Inc., a company that intended to operate an IHOP franchise.[11]

In early July 2007, Kimmelman learned of the IHOP plans.[12] On July 10, 2007, McDonald's wrote to Defendants objecting to the operation of an IHOP, and indicated that McDonald's considered the proposed IHOP a breach of the restrictive covenant.[13] Defendants responded in a letter dated July 17, 2007. In relevant part, the letter reads as follows:

> Your objection is without merit.
>
> First, Article 4.F applies to fast food restaurants and establishments.[14] The IHOP restaurant is not a fast food restaurant or establishment.
>
> Second, as your letter recognizes, the premises to be occupied by the IHOP restaurant were previously occupied by a Ground Round restaurant, and the Lease specifically excepts from the operation of Article 4.F the existing Ground Round Restaurant as well as "any renewal or replacement therefore for the same or similar use." Clearly, the IHOP restaurant is a replacement of the Ground Round Restaurant. Thus, even if Article 4.F was not limited to fast food restaurants or establishments (which it is), McDonald's would have no basis for objecting to the operation of an IHOP restaurant. Therefore, Landlord has not breached Article 4.F or any other

---

it was signed, and the document does not accurately quote or describe the final language of the restrictive covenant, e.g., it did not contain the "so-called fast food modifier" that appeared in the final version of the lease. *See* Defs. Findings of Fact at 14–15. Accordingly, for purposes of this litigation, the operative document is the lease agreement between Highlander and McDonald's, not the inaccurate subsequent recording of the covenant.

7.  Pl.Ex. 1 at 4.

8.  A "use clause" in a lease enumerates the lawful purposes for which a particular property may be used.

9.  Pl.Ex. 1 at Ex. C.

10.  Transcript Day 1 at 107.

11.  *See* Defs. Ex. M.

12.  Transcript Day 1 at 118. McDonald's also initially challenged a potential Starbucks installation in the shopping center as a violation of the restrictive covenant. *See* Compl. at 6–7. At the Bench Trial, however, the Parties agreed that a potential Starbucks installation no longer presented a live issue with respect to the injunctive relief sought. *See* Transcript Day 1 at 132–133.

13.  *See* Pl.Ex. 6.

14.  As explained below, this court agrees with Defendants' position.

provision of the lease.[15]

On July 31, 2007, McDonald's filed suit in this court alleging that Highlander Plaza was violating the restrictive covenant.[16] McDonald's sought to enjoin Defendants "from leasing to, installing, or permitting the construction or installation of a[n] ... International House of Pancakes restaurant on the premises...."[17] McDonald's also sought a Permanent Injunction, asking the court for an "order permanently enjoining Defendants and their successors from permitting the establishment of a[n] ... IHOP in violation of the terms of the lease and the recorded Covenant Not to Compete...."[18] McDonald's also asserted a count for breach of lease, as well as a request for a declaration that the "establishment of an IHOP restaurant in the Plaza constitutes a breach of the Lease and a violation of the recorded Covenant Not to Compete."[19]

On October 3–4, 2007, a Motion Hearing/Bench Trial ("Bench Trial") was held on the merits, and this court heard testimony from six witnesses and received for-ty-one exhibits in evidence. The matter was taken under advisement. On November 2, 2007, the Court Reporter completed the transcript of the Bench Trial and made it available to counsel. Plaintiff and Defendants filed proposed Findings of Fact and supporting legal memoranda on December 3, 2007.[20]

There are two interrelated issues before the court: (1) whether Defendants violated the restrictive covenant by leasing space to the IHOP franchisee; and, consequently, (2) whether Defendants may continue to permit operation of the IHOP on the premises.

## Discussion

### A. Standard for Injunctive Relief

■ Because the Bench Trial served as hearing on the merits, this court evaluates the appropriateness of injunctive relief under the standard for a permanent injunction.[21] "The standard for issuing a permanent injunction requires the district court to find that (1) plaintiffs prevail on the

---

15. *See* Pl.Ex. 7.

16. *See* Compl.

17. Pl. *Mot. for Prelim. Inj.* at 1[# 3]. *See also* Compl. at 7–8.

18. *See id.* at 8–9. At the time McDonald's filed suit, Salem Pancakes was in the process of converting the former Ground Round into an IHOP. Some time thereafter, Salem Pancakes finished the renovations and opened the IHOP.

19. *See id.* at 9–10. McDonald's also sought the same with respect to a potential Starbucks installation. As noted above, however, Starbucks does not present a live controversy for purposes of the declaratory relief sought by McDonald's. *See* Transcript Day 1 at 133.

20. *See* Pl. Findings of Fact; Defs. Findings of Fact; Pl. Post–Hr'g Mem. [# 39] ("Pl.Mem."); Defs.' Post–Evid. Hr'g Mem. of Law [# 37] ("Defs.Mem.").

21. Plaintiff's legal memoranda utilizes the standard for granting a permanent injunction, while Defendant's legal memoranda utilizes the standard for granting a temporary injunction. The court notes, however, that the result would be the same under either standard. *See Amoco Prod. Co. v. Vill. of Gambell,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success."). *See also ER Holdings, Inc. v. Norton Co.,* 735 F.Supp. 1094, 1102 (D.Mass.1990). Here, because this court evaluated the merits of this case, the permanent injunction standard is appropriate. Additionally, for the reasons enumerated below, this court notes that McDonald's was previously unlikely to succeed on the merits for the same reason that McDonald's ultimately did fail to succeed on the merits.

merits; (2) plaintiffs would suffer irreparable injury in the absence of injunctive relief; (3) the harm to plaintiffs would outweigh the harm the defendant would suffer from the imposition of an injunction; and (4) the public interest would not be adversely affected by an injunction." [22].

A permanent injunction is not appropriate in this case, because McDonald's has not prevailed on the merits for the following reasons.

## B. The Restrictive Covenant[23]

### 1. Dispute as to Coverage

■ As a threshold matter, this court must determine the coverage of the restrictive covenant in the lease. The Parties vigorously disagree about the meaning of the purportedly "unambiguous" covenant.[24] McDonald's asserts that the restrictive covenant applies to all "food service establishments," arguing that the words "so-called fast food" modify only "restaurant" and not the remaining elements of the series.[25] Defendants assert that the covenant applies only to "fast food" restaurants,[26] with the phrase "so-called fast food modifying all of the elements that follow [in the clause] because of the placement of the conjunctive 'or' in the sentence." [27] This court finds that the covenant is ambiguous with respect to its coverage, because it is unclear whether "so-called fast food" modifies the whole clause or only "restaurant."

### 2. Consideration of Extrinsic Evidence

### i. Admissibility of Extrinsic Evidence

■ Because of the ambiguity, extrinsic evidence is necessary to determine the intent of the Parties with respect to coverage of the restrictive covenant. The court may consider this type of evidence without running afoul of the parol evidence rule. "The parol evidence rule only bars the introduction of prior or contemporaneous written or oral agreements that contradict, vary, or broaden an integrated writing. . . . It does not bar extrinsic evidence that elucidates the meaning of an ambiguous contract term." [28] In addition, "[U]nder Massachusetts law . . ., in order to utilize extrinsic evidence of the parties' intent, a court need not invariably find facial ambiguity". The Massachusetts courts have said:

> "When the written agreement, as applied to the subject matter, is in any respects uncertain or equivocal in meaning, all the circumstances of the parties leading to its execution may be shown for the purpose of elucidating, but not of contradicting or changing its terms." [29]

Lastly, a court may consider parol evidence "where the phraseology can support reasonable differences of opinion as to the meaning of the words employed and the

---

**22.** *Asociacion de Educacion Privada de P.R., Inc. v. Garcia–Padilla,* 490 F.3d 1, 8 (1st Cir. 2007).

**23.** This court notes that neither Party challenges the underlying validity of the restrictive covenant, only the scope of its coverage.

**24.** Both Parties assert that the covenant is unambiguous. *See* Pl. Mem. at 2–3; Defs. Mem. at 3–4.

**25.** Pl. Mem. at 2–8.

**26.** Defs. Mem. at 3–11.

**27.** *Id.* at 3.

**28.** *Kobayashi v. Orion Ventures,* 42 Mass.App. Ct. 492, 678 N.E.2d 180, 184 (1997) (citations omitted).

**29.** *ITT Corp. v. LTX Corp.,* 926 F.2d 1258, 1264 (1st Cir.1991) (emphasis removed).

obligations undertaken."[30]

Here, as noted, this court finds the covenant ambiguous and uncertain with respect to its coverage because of the "so-called fast food" language. Additionally, the phrasing of the covenant "can support reasonable differences of opinion" with respect to its coverage and the restrictions imposed on the landlord, as indicated by the Parties' own conflicting interpretations. Accordingly, to "elucidate the meaning" of the covenant, this court considers extrinsic evidence introduced at the Bench Trial regarding the intent of the Parties.

### ii.   The Extrinsic Evidence

■   At the Bench Trial, Defendants presented compelling evidence that the Parties intended the clause to restrict Highlander Plaza's ability to lease property in the shopping center to other "fast food" restaurants only, not all "food service establishments."[31]   As a result of such evidence, this court concludes that the restrictive covenant applies to fast food only.

Specifically, Defendants demonstrated that McDonald's originally sought a broad restrictive covenant, one that prohibited Highlander Plaza from renting to all other food service establishments.   The initial draft of the lease contained a restrictive covenant that read as follows:

> Landlord covenants and agrees that no property (other than the Demised Premises) now or hereafter owned, leased or controlled, directly or indirectly, by Landlord or, if Landlord is a corporation, any subsidiary of Landlord, adjacent or contiguous to the demised premises or within two (2) miles of the parameter of the demised premises (whether or not such other property is subsequently is voluntarily conveyed by landlord) shall, during the term of this lease and any extensions, be leased, used or occupied as a *restaurant, food service establishments, drive-in or walk-up eat in facility,* subject to the use clauses, exclusions and restrictions contained on page 3A of this lease.[32]

As initially written, therefore, the restrictive covenant did not contain any language pertaining to fast food, and would have prohibited Highlander Plaza from renting to any food establishment, regardless of its type of service.

During negotiations,[33] however, Highlander Plaza did not accept such a sweeping covenant.[34]   Gary Markoff ("Markoff"), counsel for Highlander who participated in the negotiations,[35] stated that Highlander was trying to "give as narrow an exclusive

---

**30.** *Suffolk Constr. Co., Inc. v. Lanco Scaffolding Co., Inc.,* 47 Mass.App.Ct. 726, 716 N.E.2d 130, 133 (1999) (*quoting Fashion House, Inc. v. K mart Corp.,* 892 F.2d 1076, 1083 (1st Cir.1989)).

**31.** McDonald's did not object to the introduction of the following evidence at the Hearing/Bench Trial.   This court acknowledges that a lack of objection to parol evidence by a party does not eliminate a possible parol evidence issue. *See Kobayashi,* 678 N.E.2d at 184 (explaining that "the parol evidence rule is one of substantive law").   As noted above, however, this court's consideration of parol evidence does not violate the rule.

**32.** *See* Defs. Ex. B at 3 (emphasis added).

**33.** A partner in Highlander, Mark Perochocky, directly negotiated with McDonald's regarding the lease terms, including the restrictive covenant. *See* Transcript Day 1 at 139.

**34.** *See id.* at 139–147.

**35.** Highlander hired Markoff to review the draft lease prepared by McDonald's and to represent Highlander "in negotiating the lease and seeing it through to execution." *Id.* at 175.

as possible."[36] As a result, Highlander only agreed to restrict its ability to lease to other fast food restaurants.[37] After negotiations, McDonald's accepted the narrower restriction.[38] Accordingly, Markoff added "so-called fast food" to modify the entire covenant:

> Landlord covenants and agrees that no property now or hereafter owned, leased or controlled, directly or indirectly, by Landlord or, if Landlord is a corporation, any subsidiary of Landlord, adjacent or contiguous to the Demised Premises or within two (2) miles of the perimeter of the Demised Premises (whether or not such property is subsequently voluntarily conveyed by Landlord) shall, during the term of this Lease and any extensions, be leased, used or occupied as a *so-called fast food* restaurant, food service establishment, drive-in or walk-up eating facility.... [39] McDonald's did not object to the "so-called fast food" language.[40]

The modification effectuated the result of the Parties' negotiations: the restrictive covenant would apply to other fast food entities only, not to all food service establishments. Indeed, during the Bench Trial, Markoff specifically and unequivocally testified that the addition of "so-called fast food" was "the product of negotiations between the parties," and was "intended to modify 'restaurant, food service establishment, drive-in or walk-up eating facility.'"[41] Markoff stated that the addition of "so-called fast food" was "[a]bsolutely not" intended "just to modify the word restaurant."[42]

### iii. McDonald's Evidence

At the Bench Trial, while not disputing much of Defendants' evidence on the issue of intent, McDonald's presented limited and unpersuasive evidence to the contrary. For example, McDonald's now claims very generally that it "has always understood [the restrictive covenant] as containing a

---

36. *Id.* at 141.

37. *See id.* at 142, 144–145. Indeed, Highlander believed that this was a "significant give" because it would have been easy to attract and rent to more fast food establishments. *See id.* at 142.

38. *See id.* at 157; Transcript Day 2 at 8. Specifically, Susan Archer, McDonald's real estate representative for the area, agreed to the more limited covenant. *See* Transcript Day 1 at 154–157.

39. Pl.Ex. 1 at 4 (emphasis added). McDonald's argues that because Defendants inserted the "so-called fast food" language, any ambiguity should be construed against Defendants. Pl Mem. at 6. Here, however, the general doctrine of *contra proferentem* is arguably not applicable, and certainly not determinative. First, Defendant's counsel only inserted the words "so-called fast food" in the lease, not the entire restrictive covenant provision. The lease, in fact, was prepared by McDonald's. Whether four words triggers the doctrine is debatable, at best. Second,

the rule often applies in insurance contracts or in standard form contracts. *See Murray on Contracts* 88. The contract and provision at issue involve neither. To the contrary, the evidence establishes that both Parties specifically negotiated this provision, and subsequently agreed to modify the provision. Third, and most important, the evidence strongly outweighs any general presumption of the doctrine. Among other things, the evidence clearly demonstrates that both Parties agreed to restrict the provision to fast food only. Defendants' lawyer happened to be the one to insert the narrowing language, and McDonald's did not object to the revised language of the covenant after the insertion by Defendants.

40. Indeed, there is no evidence that McDonald's ever objected to the language. *See* Transcript Day 1 at 180–181.

41. *Id.* at 180. *See also* Defs. Ex. B; Defs. Ex. C.

42. Transcript Day 1 at 180.

broad restriction, prohibiting the landlord from leasing to any restaurant or other type of food facility...."[43] McDonald's, however, did not dispute what Defendants clearly established at the Bench Trial, specifically that: (1) McDonald's accepted a narrower version of the covenant during lease negotiations; (2) counsel for Highlander inserted the words "so-called fast food" before the restrictive covenant to achieve the narrower restriction, which reflected the intent of the parties; and (3) McDonald's did not object to the revised language of the covenant. Indeed, McDonald's did not present the testimony of the person who could have confirmed or denied McDonald's acceptance of the narrower version of the covenant—Susan Archer, McDonald's director of development for the area.

Additionally, McDonald's argument regarding the recorded version of the restrictive covenant is unpersuasive. McDonald's asserts that the recorded covenant is the "only contemporaneous writing that exists to evidence the parties' intent,"[44] and notes that the recorded covenant does not contain the fast food limitation.[45] According to McDonald's, this "establishes that the 'fast food' qualifier was not intended by the parties to be implied in each item in the series."[46]

First, however, as noted, McDonald's did not dispute the testimony that Defendants offered in support of their position on the intent of the Parties. Second, beyond mere assertion, McDonald's presented no evidence that the recorded covenant

demonstrated the true intent of the parties, as opposed to the covenant contained in the executed lease. Third, the recorded covenant is of limited probative value because it was recorded ten months after the fact, does not accurately reflect the final lease language and is not the operative document in this case.

Furthermore, McDonald's implies that Defendants unilaterally inserted the "so-called fast food" language into the lease.[47] The record, however, does not support this allegation. First, McDonald's makes much of the fact that Markoff did not mention the insertion in his letter to Michael Kuronen, the regional real estate manager for McDonald's, regarding revisions to the lease.[48] Nothing in the record, however, indicates that this was anything more than a simple oversight. Second, as noted, McDonald's did not dispute the testimony that Defendants offered in support of their position on the intent of the Parties.

### 3. Exhibit C is Not Inconsistent with a Fast Food Only Covenant

■ Counsel for Highlander also revised the language for the "use" exception in the covenant, and McDonald's accepted this revision as well.[49] Instead of the covenant being "subject to the use clauses, exclusions and restrictions contained on page 3A of this lease,"[50] the covenant was revised to state, "[T]he Restrictive Covenant shall not apply to any use by the tenants listed and described on Exhibit C attached hereto and made a part hereof or to any exclusives or restrictions contained

---

43. Pl. Mem. at 4.

44. *Id.* at 7.

45. *Id.* at 6.

46. *Id.* at 7 (emphasis removed).

47. *See id.* at 7–8.

48. *See id.* (discussing Defs. Ex. A).

49. *See* Transcript Day 1 at 185–186; Transcript Day 2 at 2, 8.

50. *See* Defs. Ex. B at 3.

in the lease for any tenant or restrictions contained in the lease for any tenant so listed and described or any renewal or replacement thereof for the same or similar use."[51]

McDonald's argues that Exhibit C "offers further support for the finding that the covenant . . . is not limited to 'so-called fast food' restaurants."[52] McDonald's asserts that Exhibit C is inconsistent with a "fast food only" interpretation of the restrictive covenant, because Exhibit C contains a number of establishments, several of which are not fast food or traditional "food service establishments," e.g., CVS, Shaws Markets and Jenny Craig.[53]

Initially, this argument is appealing from a logical standpoint: Why would the Parties need to exempt these establishments from the restrictive covenant if the covenant applied only to fast food? This argument fails, however, once we examine the purpose behind the Exhibit C exemptions.

Defendants explain that "at the time of leasing, there are existing tenants who have rights that are prior to the rights that will be created by a new lease."[54] At Highlander Plaza, "The existing leases contained broad 'use' provisions that granted the tenants not only the existing uses but also future uses that could conflict with the restrictive covenant being negotiated between Highlander and Mc-

Donald's."[55] Exhibit C, therefore, puts McDonald's on notice "that McDonald's rights, including the rights in the Restrictive Covenant, would be subject to the rights of tenants listed and described on Exhibit C. . . ."[56] In other words, Exhibit C merely alerts McDonald's to the fact that other tenants' leases may grant those tenants (and any potential assignees) rights that limit the application of the restrictive covenant in the McDonald's lease to those tenants.[57]

Additionally, the McDonald's lease itself had a broad use clause ("any lawful purpose"), as well as a broad assignment right.[58] As noted by Markoff, "[I]t's very possible that McDonald's during a very long term of a lease could assign the lease or sublet to someone and that someone or entity should know what the restrictions are of the shopping center."[59] Accordingly, in addition to putting McDonald's itself on notice of other tenants' rights, the use clauses also put potential future assignees on notice.

Exhibit C, therefore, serves "a notice disclosure purpose,"[60] and does not conflict with a fast-food only covenant.

### 4. Note on Construction of Restrictive Covenants

The extrinsic evidence is more than sufficient for this court to conclude that the clause applies only to fast food.

---

**51.** *See* Pl.Ex. 1 at 4.

**52.** Pl. Findings of Fact at 8.

**53.** *See* Pl. Mem. at 5, 8–11.

**54.** Defs. Mem. at 9.

**55.** *Id.*

**56.** *Id.* Likewise, Exhibit C also puts Mc-Donald's on notice that its rights under its broad use clause may be subject to the use clauses of other tenants. As explained by Markoff, "McDonald's could do anything that's lawful except anything that is contained in other leases in the shopping center which are restrictive and give exclusives to other tenants." Transcript Day 2 at 11.

**57.** *See also id.* at 6–7.

**58.** *See* Transcript Day 1 at 182.

**59.** *Id.*

**60.** *Id.*

In addition, however, restrictive covenants are restraints on the alienability of land, and traditional rules governing these restraints add further support to this conclusion. The Supreme Judicial Court of Massachusetts has noted, "We recognize restrictions on land are disfavored, and they in general are to be construed against the grantor and in favor of freedom of alienation."[61] More specifically, any ambiguity in a restrictive covenant must be "resolved in favor of the freedom of land from servitude,"[62] meaning the less restricted use.[63]

Here, a narrower interpretation of the covenant results in increased alienability of the premises. Instead of prohibiting Highlander Plaza from leasing space to all other "food service establishments"—a significant limitation on alienability given Highland Plaza's status as a large shopping center with the ability to attract a diverse mix of tenants [64]—the narrower interpretation of the covenant only prohibits Highlander from leasing to other fast food restaurants. This significantly enhances the alienability of the premises. As well, the ambiguity in the covenant's coverage should be construed in favor of the less restricted use, also resulting in the narrower "fast food only" interpretation.

## C. Categorizing IHOP

Although the lease does not define "so-called fast food," the Parties do not dispute that IHOP is not a fast food restaurant under any definition of "fast food" or "quick service"—the industry descriptor for fast food establishments. McDonald's and Defendants both state that IHOP is a *full* service, family style restaurant.[65]

## D. The Restrictive Covenant Does Not Apply

Because the restrictive covenant in the lease applies only to fast food restaurants, and IHOP is not a fast food restaurant, the covenant did not prohibit Defendants from leasing the former Ground Round space to the IHOP franchisee, Salem Pancakes.[66]

**61.** *Stop & Shop Supermarket Co. v. Urstadt Biddle Props.*, 433 Mass. 285, 740 N.E.2d 1286, 1289 (2001) (quotations and citations omitted). *See also, e.g., Almacs, Inc. v. Drogin*, 771 F.Supp. 506, 509 (D.R.I.1991) (discussing Rhode Island law: "A court, therefore, must consider the oft-repeated maxim that restrictive covenants are to be strictly construed in favor of the free alienability of land while still respecting the purposes for which the restriction was established ....") (internal citations and quotations omitted); *Snyder's Drug Stores, Inc. v. Sheehy Properties, Inc.*, 266 N.W.2d 882, 885 (Minn.1978) ("A final, perhaps competing, consideration is that public policy dictates that restrictive covenants, being restraints of trade be strictly construed.") (citations omitted).

**62.** *St. Botolph Club, Inc. v. Brookline Trust Co.*, 292 Mass. 430, 198 N.E. 903, 904 (1935). *See also, e.g., Carousel Snack Bars, Inc. v. Crown Constr. Co.*, 439 F.2d 280, 283 (3rd Cir.1971) ("Pennsylvania law requires that restrictive covenants in leases must be construed strictly and that any ambiguity be re-

solved against the party benefitting from the restrictions."); *Queen's Grant II Horizontal Property Regime v. Greenwood Development*, 368 S.C. 342, 628 S.E.2d 902, 916 (2006) (discussing South Carolina law: "We begin with the premise that in construing restrictive covenants, ambiguities must be strictly construed against the party seeking to enforce them.").

**63.** *See, e.g., Drogin*, 771 F.Supp. at 510 (discussing Rhode Island law: "Where there is ambiguity, however, the intention of the parties as shown by the covenant governs, subject to the further rule that the ambiguity is to be resolved in favor of an unrestricted use.").

**64.** *See* Transcript Day 1 at 141–144.

**65.** *See, e.g.,* Pl. Findings of Fact at 12–13; Defs. Findings of Fact at 18 ("IHOP is not a 'fast food restaurant.'").

**66.** Because the restrictive covenant does not apply, this court does not evaluate whether any exceptions to the covenant apply.

Accordingly, Defendants may continue to permit operation of the IHOP on the premises without violating the covenant.

## Conclusion

Because the covenant does not apply, McDonald's does not prevail on the merits.[67] Accordingly, (1) Plaintiff's request for preliminary and permanent injunctive relief is DENIED; (2) Plaintiff's claim for breach of lease FAILS; and (3) Plaintiff's request for declaratory relief is DENIED.

An Order has issued.[68]

---

**67.** Because McDonald's has not prevailed on the merits, and all four elements of the injunction standard must be met for an injunction to issue, this court need not address the remaining elements of the standard.

**68.** *See* Order [# 41].